IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES KARL, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ZIMMER BIOMET HOLDINGS, INC., a Delaware corporation; ZIMMER US, INC., a Delaware corporation; BIOMET U.S. RECONSTRUCTION, LLC, an Indiana limited liability company; BIOMET BIOLOGICS, LLC, an Indiana limited liability company; and BIOMET, INC., an Indiana corporation,<br><br>Defendants. | No. C 18-04176 WHA<br><br>**AMENDED ORDER ON MOTION FOR SUMMARY JUDGMENT, MOTION TO FILE UNDER SEAL, AND REQUEST FOR CONTINUANCE UNDER RULE 56(d)** |

## INTRODUCTION

In this putative employment class action, defendants move for summary judgment and to file under seal. Plaintiff requests a denial or continuance of summary judgment under Rule 56(d). For the reasons stated below, defendants' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**. Defendants' motion to file under seal is **GRANTED**. Plaintiff's Rule 56(d) motion is **DENIED**.[1]

---

[1] This order amends the prior order on defendants' motion for summary judgment, administrative motion to file under seal, and plaintiff's request for continuance under Rule 56(d) (Dkt. No. 118) solely to certify for interlocutory appeal the "outside salesperson" exemption issues pursuant to plaintiff's request (*see* Dkt. No. 125).

United States District Court
For the Northern District of California

**STATEMENT**

A prior order has set forth the detailed background of this case (Dkt. No. 70). In brief, defendant (and parent corporation) Zimmer Biomet Holdings, Inc. ("Zimmer Biomet Holdings") and its subsidiaries — including defendants Zimmer US, Inc. ("Zimmer US"); Biomet U.S. Reconstruction, LLC ("Biomet Reconstruction"); Biomet Biologics, LLC ("Biomet Biologics"); and Biomet, Inc. ("Biomet") — engaged in designing, manufacturing, and marketing biopharmaceutical and medical device products. Relevant here, Zimmer US engaged with Biomet Reconstruction and Biomet Biologics in selling products focused on knees, hips, sports medicine, foot and ankle, extremities, and trauma. They primarily sold these products to physicians and hospitals (Dkt. Nos. 86, Exh. 1 at 82:24–83:2; 89 ¶ 4).

In August 2015, plaintiff James Karl signed a sales associate agreement with Zimmer US, Biomet Reconstruction, and Biomet Biologics and thereafter began working for those three entities as a sales representative selling orthopedic devices in California. That sales associate agreement classified Karl as an "independent contractor." He was paid through Edge Medical, LLC, which he established for tax purposes (Dkt. Nos. 14-2 ¶ 1; 86, Exh. 1 at 243:17–22, 250:9–12).

Karl was a member of "Team Golden Gate," led by Territory General Manager Don Quigley (an employee who managed defendants' operations in a given territory), which covered sales in the San Francisco Bay Area region. Members of Team Golden Gate were paid on a commission-only basis under a "pooled" arrangement. That is, defendants (1) set a "base rate" commission percentage for each product type sold, (2) pooled each team member's base rate commissions, and (3) paid each member a predetermined percentage of the pooled commissions, regardless of the amount of commissions that member personally generated (Dkt. Nos. 97-1, Exh. A at 117:6–119:22; 97-2 ¶¶ 5–6).

As part of his job duties, Karl spent on average between 60 and 70 percent of his time on "case coverage." This involved assisting surgeons in the operating room — including setting up defendants' products, informing a surgeon of the product's safety and effectiveness, and fielding a surgeon's questions — and planning for procedures, such as designing modifications for

implants. Karl's workday averaged between ten to twelve hours (Dkt. Nos. 86, Exh. 1 at 223:16–22; 97-1, Exh. A at 68:17–69:7, Exh. B at 222:18–20; 97-2 ¶ 12).

In July 2018, Karl filed the instant putative class action and now seeks eight claims for relief: (1) violation of the FLSA; (2) failure to pay overtime wages under California law; (3) failure to provide meal periods under California law; (4) failure to provide rest periods under California law; (5) failure to provide itemized wage statements; (6) failure to reimburse business expenses; (7) unfair business practices; and (8) PAGA claim (Dkt. No. 41 ¶¶ 51–106). The gravamen of these claims stems from the allegation that defendants misclassified their sales representatives as independent contractors rather than employees and thus denied them various benefits under federal and California wage-and-hour laws.

All defendants now move for summary judgment against Karl (individually) on his (1) FLSA claim (Claim 1), arguing that he cannot prove that he was an "employee" and that even if he were an employee, he qualified as an exempt "outside salesperson" under the FLSA; and (2) various state law claims (Claims 2–4, 6–7), arguing that Karl cannot prove he was an "employee" under California law, was an exempt "outside salesperson" under California law regardless, and had the opportunity to take meal and rest periods. Zimmer Biomet Holdings and Biomet separately further move for summary judgment on *all* claims on the independent ground that they neither defendant employed Karl or contracted with him (Dkt. No. 85 at 1).

Karl opposes (Dkt. No. 97) and concurrently moves under Rule 56(d) for a denial or continuance of summary judgment (Dkt. No. 98). This order follows full briefing and oral argument.

**ANALYSIS**

Summary judgment is appropriate if there is no genuine dispute as to any material fact. FRCP 56(a). A genuine dispute of material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978,

984 (9th Cir. 2007). "Rather, it draws all inferences in the light most favorable to the nonmoving party." *Ibid*.

### 1. OVERTIME WAGES UNDER THE FLSA AND CALIFORNIA LABOR CODE (CLAIMS 1–2).

Defendants argue that Karl cannot prove he was an "employee" under the FLSA or California law such that he was entitled to overtime wages. They further contend that even assuming he was misclassified as an independent contractor, Karl qualified as an exempt outside salesperson for the purposes of his overtime claims. This order agrees and holds that, even if Karl was an employee, he qualified as an exempt "outside salesperson" under both federal and state law.[2]

#### A. Exemption Under the FLSA.

Under the FLSA, an employee is entitled to overtime wages unless the employer shows that the employee worked "in the capacity of outside salesman." 29 U.S.C. § 213(a)(1). The outside salesperson exemption applies to any employee (1) whose "primary duty" is (as relevant here) "making sales," and (2) who "is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty." 29 C.F.R. § 541.500(a). An employee's "primary duty" means "the principal, main, major or most important duty that the employee performs." *Id*. § 541.700(a). This analysis must be guided by the totality of the circumstances, "with the major emphasis on the character of the employee's job as a whole." *Ibid*.

Exempt sales activities include "work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections" and "[o]ther work that furthers the employee's sales efforts . . . including, for example, writing sales reports, updating or revising the employee's sales or display catalogue, planning itineraries and attending sales conferences." *Id*. § 541.500(b). Promotional work is "one type of activity often performed by persons who make sales, which may or may not be exempt outside sales work,

---

[2] Because this order rules on the overtime wages claims under federal and California law based on the "outside salesperson" exemption, it need not and does not decide the "independent contractor" misclassification issue in ruling on the overtime wages claims.

4

depending upon the circumstances under which it is performed." *Id*. § 541.503(a). Promotional work "performed incidental to and in conjunction with an employee's own outside sales or solicitations is exempt work"; promotional work "incidental to sales made, or to be made, by someone else is not exempt outside sales work." *Ibid*.

"Whether an activity is excluded from hours worked under the FLSA . . . is a mixed question of law and fact. The nature of the employees' duties is a question of fact, and the application of the FLSA to those duties is a question of law." *Ballaris v. Wacker Siltronic Corp.*, 370 F.3d 901, 910 (9th Cir. 2004). "An employer who claims an exemption from the FLSA bears the burden of demonstrating that the exemption applies." *Klem v. Cty. of Santa Clara, California*, 208 F.3d 1085, 1089 (9th Cir. 2000).

Here, both sides agree that Karl spent the majority of his time attending surgeries and assisting physicians with the implantation of defendants' medical devices. The parties, however, sharply dispute whether case coverage constituted sales-related activity. Defendants, of course, argue that the primary reason Karl assisted surgeons was to sell their products (Dkt. No. 85 at 16). Karl, on the other hand, describes his role as "a product and procedure expert" who advised surgeons on implant procedures (Dkt. No. 97 at 9). This order finds that, in light of the totality of the circumstances and the purpose of the FLSA exemption, Karl's primary duty was to make sales and case coverage constituted sales-related activity.

*First*, defendants hired Karl as a sales representative whose job was "to exercise best efforts to aggressively market and sell the Products in the Territory" (Dkt. No. 14-2 ¶ 6(a)). During his deposition, Karl described himself and his team members as "salespeople" who were "driven by sales" (Dkt. 86, Exh. 1. at 101:19–23). He agreed that his "most important goal as a sales rep" was "getting doctors to use more Zimmer products" (*id.*, Exh. 1 at 185:15–24).

*Second*, Karl's own testimony revealed that his motivation for covering cases remained directly related to sales. His self-dubbed "solution-selling" sales technique — which Karl developed himself based on his "years of experience in the medical device industry" — motivated him to assist surgeons with their cases (*id.*, Exh. 1 at 184:19–185:2). Under this sales approach, doctors "c[a]me to [him] with a problem, and [he] tr[ied] to figure it out for them, tr[ied] to figure

5

out options" (*id.*, Exh. 1 at 179:4–180:12).  Karl illustrated this sales method as follows (*id.*, Exh. 1 at 179:20–180:9):

> For instance, two, three weeks ago, a doctor came to me that uses our proximal humerus plate.  He said he has a problem with our long plate because it gets in the way of the insertion of the deltoid.  And I was able to find out our new plate has a solution for that and the long plates have a jog in it to go around.  He had already called the competitor in; the competitor was going to do the case.  And I contacted him that night and I told him, "I have a solution," sent him the technique guide.  He looked at it and he used it.  So solution-sell.  And he had — he hadn't reached out to me before.  He had reached out to me after he told me, "Look, I'm using this."  So he never asked me if I had anything.

Karl testified that this level of communication was his most successful sales technique and agreed that "being with doctors at surgeries g[ave him] the opportunity to develop [a] relationship with them and talk with them about . . . solutions" (*id.*, Exh. 1 at 180:13–25).  This was important because "in [his] industry sometimes, you have great relationships with surgeons or hospitals, and wherever you go, they'll follow," thereby increasing the chances to sell more products to those particular customers (*id.*, Exh. 1 at 105:18–25, 107:3–109:2, 176:24–177:5).  Karl described his professional role as a "senior sales consultant" to recognize the fact that orthopedic surgeons valued his ability to advise on implant procedures (*id.*, Exh. 1 at 127:5–17).  He testified that surgeons called him at least in part because they valued his knowledge and ability to help plan the implant procedures, which in turn allowed him to "sell[] the complete bag" for certain products (*id.*, Exh. 1 at 181:1–12).  Attending surgeries also helped Karl stave off competition.  That is, if Karl is not supporting a surgeon's case, then a competitor may step in and take his business (*id.*, Exh. 1 at 170:14–16, 174:20–176:13, 176:20–23,180:1–6).

Karl responds that the "more realistic view" of his role is that of "product and procedure expert, answering doctors' questions and providing suggestions or options for possible troubleshooting needs" in order "to ensure the safe effective use of" defendants' products (Dkt. No. 97 at 9, 17).  He testified that he had to attend surgeries "to give the nurse the right implants to open" and that without him, "[t]he procedure wouldn't happen" (Dkt. No. 86, Exh. 1 at 199:18–25).  He further contends that case coverage cannot be considered "making a sale" for the purposes of the FLSA because the product was already sold by the time he was in the operating

6

1 room assisting the surgeon (a point which defendants dispute) (Dkt. Nos. 97 at 17; 100 at 8). Nor
2 did surgery attendance directly correlate to a future sale, according to Karl (Dkt. No. 97 at 17).

3 Though Karl wishes to isolate his case coverage activity from his overarching sales
4 technique, his revisionist view of his own testimony is insufficient to raise a genuine issue of
5 material fact. Karl does not offer any evidence showing that he was hired as a "product and
6 procedure expert" apart from his sales experience in the medical device industry. At bottom, his
7 own testimony revealed that he assisted surgeons in order to sell more products. Thus regardless
8 of the timing of the sale, the totality of the circumstances shows that case coverage was related to
9 making sales.

10 *Third*, this finding is consistent with the purpose of the exemption. *Christopher v.*
11 *SmithKline Beecham Corporation*, 567 U.S. 142 (2012), is instructive. There, the Supreme Court
12 held that pharmaceutical sales representatives qualified as outside salespersons exempt from the
13 FLSA's overtime requirements where the sales representatives' primary objective was "to obtain
14 nonbinding commitments from physicians to prescribe their employer's prescription drugs in
15 appropriate cases." *Id*. at 147. To support its holding, the Supreme Court opined that the
16 plaintiffs "b[ore] all of the external indicia of salesmen." *Id*. at 165. That is, they "were hired for
17 their sales experience." *Ibid*. "They worked away from the office, with minimal supervision, and
18 they were rewarded for their efforts with incentive compensation." *Id*. at 166. The Supreme
19 Court noted that the outside salesperson exemption "is premised on the belief that exempt
20 employees typically earned salaries well above the minimum wage and enjoyed other benefits
21 that set them apart from the nonexempt workers entitled to overtime pay." *Ibid*. (citation, internal
22 quotation marks, alteration omitted). It further observed that the plaintiffs were "well
23 compensated for their efforts," as each "earned an average of more than $70,000 per year and
24 spent between 10 and 20 hours outside normal business hours each week performing work related
25 to his assigned portfolio of drugs in his assigned sales territory," and thus were "hardly the kind
26 of employees that the FLSA was intended to protect." *Id*. at 151, 166.

27 So too here. Karl regularly earned more than $130,000 annually and was paid through his
28 LLC for tax purposes (Dkt. No. 86, Exh. 1 at 239:2–22, 240:14–25, 243:17–246:11). Those

7

earnings from defendants were based solely on commissions, which incentivized Karl to maximize his sales (*id*., Exh. 1 at 177:6–10, 178:5–18). He was hired as a "local expert[]" to use his "unique skill and connections to physicians . . . to sell medical devices" (Dkt. No. 89 ¶ 9). And, Karl enjoyed a high degree of autonomy, as he did not report his hours, scheduled his own cases with surgeons directly, was subject to relatively minimal supervision, and was regularly engaged away from defendants' place of business (*id*. ¶ 10; Dkt. No. 86, Exh. 1 at 192:10–17, 214:22–215:7, 228:23–229:18).

Karl asserts that "a hallmark of an outside salesperson is that "he can earn as much or as little, within the range of his ability, as his ambition dictates" (Dkt. No. 97 at 18 (quoting *Jewel Tea Co. v. Williams*, 118 F.2d 202, 207–08 (10th Cir. 1944)). He argues that since he is paid a fixed percentage of his *team's* commission pool, his earnings are within his team members' and defendants' control of the pool payments. As such, "one of the key underpinnings of the exemption is missing," according to Karl (*id*. at 19). But as discussed above, Karl and his team members received compensation solely through commissions. His compensation was still generally commensurate with his sales efforts — ultimately, the more he sold, the more money he made. He testified that this arrangement — pooled or not — incentivized him to make more sales (*see* Dkt. No. 86, Exh. 1 at 177:11–178:18). And, if he was unhappy with the sum in a given paycheck, he could demand more money to his territory general manager (*see id*., Exh. 1 at 114:25–115:15). That Karl's commission did not precisely correlate with his efforts fails to negate this incentive. Karl has failed to raise a triable issue of fact. Accordingly, defendants' motion for summary judgment on this ground as to Claim 1 is **GRANTED**.

### B. Exemption Under the California Labor Code.

Under California law, "outside salespersons" are similarly exempt from statutory overtime, minimum wage, and meal-and-rest-period requirements. Cal. Lab. Code § 1171. California Code Regulations define an "outside salesperson " as "person, 18 years of age or over, who customarily and regularly works more than half the working time away from the employer's place of business selling tangible or intangible items or obtaining orders or contracts for products,

services or use of facilities." Cal. Code Regs., tit.8, § 11070, subd. 2(J) (Wage Order No. 7-2001(2)(J)).

Unlike the FLSA, which focuses on an employee's "primary duty," California law takes "a quantitative approach, looking to the actual hours spent on sales activity to determine if an employee is primarily a salesperson." *Ramirez v. Yosemite Water Co., Inc.*, 20 Cal. 4th 785, 801 (1999). That is, an employee is exempt if more than fifty percent of his job duties involved "sales-related activities." *See id*. at 802. Moreover, California law "does not contain any provision that reclassifies intrinsically nonexempt nonsales work as exempt based on the fact that it is *incidental to* sales." *Id*. at 797.

Courts must take a holistic view of the "realistic" requirements of a job's duties in determining whether an employee qualifies as an outside salesperson. They must look at "first and foremost, how the employee actually spends his or her time." *Id*. at 802. The court must then "also consider whether the employee's practice diverges from the employer's realistic expectations, whether there was any concrete expression of employer displeasure over an employee's substandard performance, and whether these expressions were themselves realistic given the actual overall requirements of the job." *Ibid*. Federal law provides persuasive authority where, as here, California law is "patterned on federal statutes," and thus courts may "look to analogous interpretations of federal law in making the determination of what constitutes 'selling' within the meaning of California law." *Moore v. Int'l Cosmetics & Perfumes, Inc.*, No. EDCV41179DMGDTBX, 2016 WL 3556610, at *5 (C.D. Cal. June 24, 2016) (Judge Dolly Gee) (collecting cases).

Again, the current record shows that Karl — who himself pitched case coverage as part of his solution-selling sales method — qualified as an exempt "outside salesperson" under California law. In opposition, he merely argues that for the reasons he asserted in connection with the FLSA claim, case coverage was unrelated to "sales activity" under California law (Dkt. No. 97 at 19). This order disagrees for the reasons discussed above. Both defendants' realistic expectations of Karl's role and Karl's own view of his job duties in the medical device industry point to this conclusion. *See Yacoubian v. Ortho-McNeil Pharm., Inc.*, No. SACV07-00127CJC

9

MLGX, 2009 WL 3326632, at *6 (C.D. Cal. Feb. 6, 2009) (Judge Cormac Carney), *aff'd sub nom. Delgado v. Ortho-McNeil, Inc.*, 476 F. App'x 133 (9th Cir. 2012) (finding pharmaceutical sales representatives as exempt from overtime wages under California law). Accordingly, defendants' motion for summary judgment on this ground as to Claim 2 is **GRANTED**.

### 2. MEAL AND REST PERIODS (CLAIMS 3–4).

The applicable IWC wage order provides that "[t]he provisions of this order" — including the meal and rest period provisions — "shall not apply to outside salespersons." Cal. Code Regs. tit. 8, § 11040 subd. 1(C) (Wage Order 4-2001(1)(C)). Karl's claims that defendants failed to provide meal and rest periods in violation of California law similarly fail for the reasons discussed above. Accordingly, defendants' motion for summary judgment as to Claims 3 and 4 is **GRANTED**.

### 3. EXPENSE REIMBURSEMENTS UNDER CALIFORNIA LABOR CODE (CLAIM 6).

California law requires an employer to indemnify an employee "for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties." Cal. Lab. Code § 2802(a). Defendants contend that Karl's claim that they failed to reimburse his business expenses under California law fails because he cannot prove he was an employee (Dkt. No. 85 at 1).

Both sides agree that *S.G. Borello & Sons v. Department of Industrial Relations*, 48 Cal. 3d 341 (1989), governs (*id*. at 20; Dkt. No. 97 at 22–23). "The principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired." *Borello*, 48 Cal. 3d at 350 (quoting *Tieberg v. Unemployment Ins. App. Bd.*, 2 Cal. 3d 943, 946 (1970)) (alteration omitted). What matters is not "how much control a hirer exercises, but how much control the hirer retains the right to exercise." *Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522, 533 (2014) (emphasis omitted). "[T]he right-to-control test does not require absolute control." *Alexander v. FedEx Ground Package Sys., Inc.*, 765 F.3d 981, 990 (9th Cir. 2014). Rather, the relevant question is whether the employer retained "all necessary control" over the worker's performance. *Borello*, 48 Cal. 3d at 357. In addition to the right to control, *Borello* recognizes a list of secondary indicia that

inform the employment status inquiry, such as "whether the one performing services is engaged in a distinct occupation or business," "the length of time for which the services are to be performed," and "whether or not the work is a part of the regular business of the principal." *Id*. at 351.

"[U]nder California law, once a plaintiff comes forward with evidence that he provided services for an employer," as here, "the employee has established a prima facie case that the relationship was one of employer/employee." *Narayan v. EGL, Inc.*, 616 F.3d 895, 900 (9th Cir. 2010). The burden then "shifts to the employer, which may prove, if it can, that the presumed employee was an independent contractor." *Ibid*. "[I]n order to prevail on [a] motion for summary judgment," a defendant must establish that "a jury would be compelled to find that it had established by a preponderance of the evidence that the [plaintiff was an] independent contractor[]." *Ibid*. Our court of appeals has noted that "[t]his hurdle is particularly difficult for [a defendant] to overcome in light of . . . the multi-faceted test that applies in resolving the issue whether the [plaintiff is an] employee[]." *Ibid*. That is, "it is the rare case where the various factors will point with unanimity in one direction or the other." *Id*. at 901 (citation omitted). "If we are to have multiple factors, we also should have a trial. A fact-bound approach calling for the balancing of incommensurables, an approach in which no ascertainable legal rule determines a unique outcome, is one in which the trier of fact plays the principal part." *Ibid.* (quoting *Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1542 (7th Cir. 1987) (Easterbrook, J., concurring)).

Here, viewing the record in the light most favorable to Karl, this order finds that a reasonable jury could reach different conclusions in applying the multi-factored test, as illustrated by the following nonexhaustive list. Defendants could terminate Karl's contract "at any time . . . with or without cause" on a "ten (10) days' written notice," while Karl could similarly terminate "with or without cause" on "sixty (60) days' written notice" (Dkt. No. 14-2 ¶ 5(a)). In determining the extent of control, an employer's "right to discharge at will, without cause" is "strong evidence in support of an employment relationship." *Borello*, 48 Cal.3d at 350. The contract further provided that upon termination, Karl must (Dkt. No. 14-2 ¶ 5(c)):

> [T]ake any and all actions . . . necessary to facilitate the transition of [his] business (including customers and accounts) to Company . . .

11

> including, but not limited to: (i) make available and transfer
> immediately to Company . . . all Company inventory . . . , complete
> surgery schedules, complete customer and business records,
> information and data at a location to be determined by Company, (ii)
> assign to Company all telephone numbers and e-mail accounts used in
> connection with [Karl's] business, and (iii) facility any discussions
> requested by Company with customers and prospective customers . . . .
> Further, upon Company's request, [Karl] agrees to assign over to
> Company . . . to maintain, and/or to enforce any agreement [Karl] may
> have with any sales associate, employee, or contractor who works,
> covers or provides any services in the Territory.

Karl offers evidence suggesting that he was required to enter information into defendants' administrative systems, such as entering his schedule into the team's calendars (*e.g.*, Dkt. Nos. 97-1, Exh. B at 208:17–210:12 ("[T]he comments kept coming: 'They're watching,' you know, 'We need to put these in.' "); 97-2 ¶ 20). Defendants also controlled Karl's advertising: Karl had to run all his advertising by defendants first and was prohibited from promoting their products on social media (*id.*, Exh. A at 207: 3–208:5, 214:24–215:11). Drawing all inferences in favor of Karl, the foregoing is sufficient to raise a triable issue as to whether or not he was misclassified as an "independent contractor." Accordingly, defendant's motion for summary judgment as to Claim 6 is **DENIED**.

### 4. UNFAIR BUSINESS PRACTICES (CLAIM 7).

Defendants further move for summary judgment on Karl's claim under California Business and Professional Code § 17200 *et seq.*, which prohibits unlawful, unfair, and fraudulent competition, to the extent it is derivative of Karl's first, second, third, fourth, and sixth claims (Dkt. No. 85 at 22). Because Karl's sixth claim for expense reimbursement is still live, his Section 17200 claim is still viable at least to that extent. Accordingly, defendant's motion for summary judgment as to Claim 7 is **DENIED**.[3]

---

[3] Karl further argues that defendants violated the Medicare Anti-Kickback Statute in connection with their classifying sales representatives as independent contractors, which alleged violation led to unfair business practices under California law (Dkt. No. 97 at 24). In their reply, defendants request judicial notice of two advisory opinions of the Department of Health and Human Services Office of Inspector General in opposing Karl's ASK violation allegation (Dkt. No. 101). Because this order does not rely on Karl's AKS argument, defendants' request for judicial notice is **DENIED AS MOOT**.

### 5. JOINT EMPLOYMENT.

Zimmer Biomet Holdings and Biomet further move for summary judgment on all claims on the separate ground that they are not Karl's joint employer and have no relationship with Karl. This order agrees.

Employers may be "joint employers" for the purposes of the FLSA, with each joint employer "individually responsible for compliance with the FLSA." *Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465, 1469–70 (9th Cir. 1983), *disapproved of on other grounds by Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985). The "economic reality" test for determining employment status under the FLSA involves four factors: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Id.* at 1470.

Here, Zimmer Biomet Holdings was created as a result of the merger between Zimmer US and Biomet (Dkt. No. 89 ¶ 3). It served as parent corporation to its distinct subsidiary entities, including Biomet (*ibid.*). Karl contracted with Zimmer US, Biomet Reconstruction, and Biomet Biologics only. There is no evidence that Zimmer Biomet Holdings was involved with Karl's day-to-day sales operations; those operations were managed by the three subsidiary entities Karl contracted with (*id.* ¶¶ 5, 7). Nor is there evidence that Zimmer Biomet Holdings hired any independent contractor sales representatives, remained involved with such contractor sales representatives' pay, or kept any employment records for any sales representatives (*id.* ¶ 6). Similarly, Karl offers no evidence that Biomet, a distinct entity, exerted any control over the three entities Karl contracted with or had any involvement with Karl's work as a sales representative.

Karl responds that both Zimmer Biomet Holdings and Biomet are liable because they were parties to his contract and thus analysis of their joint employer status "is not necessary" (Dkt. No. 97 at 25). He points to prior testimony of Donald Ritter, Vice President of Sales Operations for Zimmer US, who stated that (Dkt. No. 14-1 ¶ 7):

> Karl's Sales Associate Agreement defines "Affiliates" as any entity which, now or in the future, directly or indirectly, is in control of, is controlled by, or is under common control with the (sic) Zimmer US, Inc., Biomet U.S. Reconstruction, LLC, or Biomet Biologics, LLC.

13

> Based upon the organizational structure and governance of Zimmer
> Biomet, the other named Defendants Zimmer Biomet Holdings, Inc.
> and Biomet, Inc. would constitute "Affiliates" of the "Company"
> under the Sales Associate Agreement.

He then argues, *ipse dixit*, that as an affiliate, both Zimmer Biomet Holdings and Biomet were parties to the contract. Karl's point is unpersuasive. The sales associate agreement unambiguously stated at the start that the agreement was among himself, Zimmer US, Biomet Reconstruction, and Biomet Biologics, which the agreement referred to collectively as the "Company" (Dkt. No. 14-2 at 1). The Company "set[] forth the terms and conditions under which [Karl was] granted the right to promote the sale of certain products and/or services of Company" (*ibid.*). The sales associate agreement's mention of "affiliates" at various times did not transform Zimmer Biomet Holdings and Biomet into signatories. As defendants point out, Karl's suggested reading of the contract would lead to the absurd result of transforming every single "affiliate," no matter how remote their involvement with Karl's work as a sales representative, party to the contract.

Karl next argues that *Martinez v. Combs*, 49 Cal. 4th 35 (2010), rather than *Bonnette*, governs the joint employment status inquiry under California law (Dkt. No. 97 at 25). In *Martinez*, the California Supreme Court held that there exist three alternative definitions for the term "to employ." "It means: (a) to exercise control over the wages, hours, or working conditions, *or* (b) to suffer or permit to work, *or* (c) to engage, thereby creating a common law employment relationship." *Martinez*, 49 Cal. 4th at 64. Even under *Martinez*, Karl offers no evidence relating to any of the three alternative definitions that would raise an issue of fact.[4] Accordingly, defendants' motion for summary judgment on all claims in favor of Zimmer Biomet Holdings and Biomet is **GRANTED**.

---

[4] Karl cites the declaration of Donald Ritter (the 30(b)(6) witness regarding corporate organizational matters) in connection with the motion to transfer, in which he stated that Zimmer Biomet Holdings and Biomet were controlled by or in common control with the other defendants (Dkt. No. 14-1 ¶ 7). This passing statement alone, outside the context of the instant dispute over joint employment status, fails to sufficiently raise an issue of fact.

14

### 6. DEFENDANTS' ADMINISTRATION MOTION TO FILE UNDER SEAL.

Defendants seek to redact an exhibit containing Karl's commission compensation statements (Dkt. No. 91). Specifically, defendants seek to seal information related to Karl's gross sales, net sales, pre-pricing commission percentage, and post-pricing commission percentage, citing competitive harm (Dkt. No. 91-1 ¶¶ 5–6). Because this order does not rely on this specific information and the public can gain full understanding of the relevant inquiry with the information already disclosed, defendants have shown compelling reasons to seal. The motion is **GRANTED**.

### 7. KARL'S RULE 56(d) MOTION.

Concurrently with his opposition to the motion for summary judgment, Karl separately filed a motion under Rule 56(d), arguing that the summary judgment motion is premature given that the parties have yet to conclude fact discovery (Dkt. No. 98 at 2). He asserts that he "continues to seek discovery regarding Zimmer's corporate organization, and the degree of control Defendant [*sic*] have over sales representatives" (*id*. at 6). This Rule 56(d) motion comes after over ten months since the initial case management conference was held on November 1, 2018 — meaning nearly over ten months since discovery has been open to Karl (*see* Dkt. No. 24). The motion is **DENIED**.

Rule 56(d) (formerly Rule 56(f)) provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . . allow time to obtain affidavits or declarations or to take discovery." Fed. R. Civ. P. 56(d). "In general, a denial of a Rule 56[(d)] application is disfavored where the party opposing summary judgment makes a timely application which specifically identifies relevant information, and where there is some basis for believing that the information sought actually exists." *Church of Scientology of San Francisco v. I.R.S.*, 991 F.2d 560, 562 (9th Cir. 1993), *vacated in part on other grounds*, 30 F.3d 101 (9th Cir. 1994).

*First*, Karl takes issue with Donald Ritter's declaration, which defendants rely upon in seeking judgment as to all claims for Zimmer Biomet Holdings and Biomet. He complains that Ritter is an employee of Zimmer US, not of either Zimmer Biomet Holdings or Biomet, and thus

15

it is unclear how Ritter acquired his knowledge (Dkt. No. 98 at 6). Accordingly, he seeks to depose "a person with personal knowledge of" Zimmer Bioment Holdings and/or Biomet to gain more information about whether the entities operate separately and independently of each other and whether they are joint employers (*ibid.*).

Putting aside the fact that he opposed defendants' motion for summary judgment on this issue by arguing that analysis of the joint employer status "*is not necessary*" because Zimmer Biomet Holdings and Biomet are parties to the sales associate agreement (Dkt. No. 97 at 25 (emphasis added)), Karl offers no adequate basis for the belief that deposing an as-of-yet unnamed person would provide meaningful rebuttal information. His request further suffers from the fact that he has been on notice of the joint employment issue since at least May 16, when defendants raised this argument in opposing his motion for conditional certification (*see* Dkt. No. 56). *Big Lagoon Rancheria v. California*, 789 F.3d 947, 955 (9th Cir. 2015), *as amended on denial of reh'g* (July 8, 2015) (holding that a district court may deny a Rule 56(d) motion where the moving party fails to show that he "diligently pursued [his] previous discovery opportunities" (quoting *U.S. Cellular Inv. Co. v. GTE Mobilnet, Inc.*, 281 F.3d 929, 934 (9th Cir. 2002))).

Karl also argues that he has already requested — and the Court has already ordered — defendants to produce additional discovery regarding organizational charts in connection with discovery relating to class certification. He contends that these charts also go to the issue of joint employment and represents that defendants have not yet produced these organizational charts (Dkt. No. 104 at 3). While he cites to paragraphs 3 and 4 of Attorney Denis Kenny's reply declaration to support this representation, Kenny's declaration says no such thing. Instead, those cited paragraphs refer to defendants' failure to produce documents regarding credentialing only (*see* Dkt. No. 104-2 ¶¶ 3–4). And, Karl has not sufficiently explained how mere organizational charts will show evidence relevant to either test under *Bonnette* or *Martinez*. He does not explain, for example, how those charts will show that Zimmer Biomet Holdings and Biomet "maintained employment records" or otherwise engaged in his work as a sales representative. *See Bonnette*, 704 F.2d at 1470; *Martinez*, 49 Cal. 4th at 64.

16

*Second*, Karl seeks discovery on defendants' administrative tools allegedly used to track and schedule surgical procedures (Dkt. No. 98 at 6–7). This relates to the level of control defendants exerted in connection with his independent contractor status. This order has already denied defendants' motion for summary judgment on this issue, rendering Karl's request moot.

*Third*, Karl further seeks information regarding defendants' purchase orders. He proffers that defendants' sales were "generated when a purchaser, such as a physician or a hospital, sign[ed] a purchase order with [d]efendants to which the assigned sales representative, like [Karl], [was] not a signatory" (Dkt. No. 98-1 ¶ 14). The purchase orders, Karl argues, "would demonstrate when a sales transaction occurred and whether 'solution-selling' to surgeons should be treated as a sales-type of duty subject to the outside sales exemption" (*ibid*.). This point is irrelevant. Karl does not explain how knowing the date of the transactions would change the outside salesperson exemption analysis. Nor does he explain how the fact that he was not a signatory to the purchase orders is relevant to the analysis. Karl himself stated that defendants required him to "try to get as many PO's" as possible (Dkt. No. 97-2 ¶ 17). This clearly indicates that his obtaining of purchase orders, even if he did not sign the orders himself, constituted his sales activities.

*Fourth*, the same is true for his contention that discovery on defendants' administrative tools such as the MyFax, FAST, and complete SMS documents would shed light of the outside salesperson exemption analysis (Dkt. No. 104 at 3–4). To repeat, Karl himself testified that he spent on average between 60 to 70 percent of his time on case coverage. Because this order finds that case coverage — which was part and parcel to Karl's solution-selling sales method — constituted sales-related activity, Karl has failed to adequately justify relief under Rule 56(d).

**CONCLUSION**

Based on the foregoing, defendants' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART** to the extent stated above and their motion to file under seal is **GRANTED**. Karl's motion under Rule 56(d) is **DENIED**.

**CERTIFICATION UNDER 28 U.S.C. § 1292(b)**

The district court hereby certifies for interlocutory appeal the issues of whether Karl was an exempt "outside salesperson" within the meaning of 29 U.S.C. § 213(a)(1) and California Labor Code § 1171. This order finds that these are controlling questions of law as to which there is substantial ground for difference of opinion and that their resolution by the court of appeals will materially advance the litigation.

**IT IS SO ORDERED.**

Dated: October 31, 2019.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE