1
2
3
4
5

MORGAN, LEWIS & BOCKIUS LLP
Eric Meckley, Bar No. 168181
eric.meckley@morganlewis.com
Joseph Lewis, Bar No. 316770
joseph.lewis@morganlewis.com
One Market, Spear Street Tower
San Francisco, California  94105-1596
Telephone: +1.415.442.1000
Facsimile:  +1.415.442.1001

6
7
8

Attorneys for Defendants
ZIMMER US, INC.; BIOMET U.S.
RECONSTRUCTION, LLC; and BIOMET
BIOLOGICS, LLC

9

UNITED STATES DISTRICT COURT

10

NORTHERN DISTRICT OF CALIFORNIA

11

SAN FRANCISCO DIVISION

12

13
14
15
16
17
18
19
20
21

JAMES KARL, on behalf of himself, and on
behalf of a class of those similarly situated,

               Plaintiff,

          v.

ZIMMER BIOMET HOLDINGS, INC.,
a Delaware corporation; ZIMMER US, INC.,
a Delaware corporation; BIOMET U.S.
RECONSTRUCTION, LLC, an Indiana limited
liability company; BIOMET BIOLOGICS, LLC,
an Indiana limited liability company; and
BIOMET, INC., an Indiana corporation,

               Defendants.

Case No. 3:18-cv-04176-WHA

**DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR CLASS
CERTIFICATION**

Date:       July 16, 2020
Time:      8:00 a.m.
Location:  12
Judge:    Hon. William H. Alsup

22
23
24
25
26
27
28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 38870649.9

## TABLE OF CONTENTS

Page(s)

I.   INTRODUCTION ................................................................................................. 1

II.   STATEMENT OF RELEVANT FACTS ........................................................... 2

    A.   The One-Year Period Prior to the Merger of Zimmer and Biomet ........................ 2

    B.   The Zimmer-Biomet Merger and California Territory Structure ............................ 2

    C.   Plaintiff James Karl .............................................................................................. 5

III.   LEGAL ARGUMENT ...................................................................................... 6

    A.   The Court Should Not Certify a Class For the Period Prior to the Merger ............ 7

        1.   The Class Definition By Its Terms Excludes the Pre-Merger Period. ........ 7

        2.   This Court Lacks Jurisdiction As to the Pre-Merger Time Period ............. 8

        3.   Karl Lacks Typicality As To the Pre-Merger Time Period ........................ 9

    B.   The Court Should Not Certify a Pre-January 1, 2020 "Misclassification Class". ................................................................................................................... 9

        1.   Defendants' Contracts and Policies Do Not Provide a Common Answer to the Misclassification Question ................................................. 10

            a.   Significant Differences Exist As to Borello's Secondary Factors. ...................................................................................... 16

    C.   The Court Should Not Certify a Post-January 1, 2020 "Misclassification Class" under the "ABC Test" ............................................................................ 19

    D.   The Court Should Not Certify An Expense Reimbursement Class. ..................... 21

    E.   Conflicts of Interest Exist Between The Putative Class Members. ..................... 22

    F.   The Court Should Not Certify A UCL Class Claim ........................................... 23

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Abdullah v. U.S. Sec. Assocs., Inc.*,
  731 F.3d 952 (9th Cir. 2013)................................................................................................6

*Aguilar v. CTB McGraw-Hill, LLC*,
  No. C 06-02160 JW, 2006 WL 8446861 (N.D. Cal. Dec. 5, 2006)........................................24

*Akaosugi v. Benihana Nat'l. Corp.*,
  282 F.R.D. 241 (2012) (J. Alsup)....................................................................................1, 10

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997)........................................................................................................6, 7

*Arnold v. Mut. Of Omaha Ins. Co.*,
  135 Cal. Rptr. 3d 213 (Cal. Ct. App. 2011) ..........................................................................15

*Ayala v. Antelope Valley Newspapers, Inc.*,
  59 Cal. 4th 522 (2014) .....................................................................................................10

*Bemis v. People*,
  109 Cal. App. 2d 253 (1952)..............................................................................................10

*Berger v. Home Depot USA, Inc.*,
  741 F.3d 1061 (9th Cir. 2014)..............................................................................................9

*Bertulli v. Indep. Ass'n of Cont'l Pilots*,
  242 F.3d 290 (5th Cir. 2001)..............................................................................................21

*Birdsong v. Apple, Inc.*,
  590 F.3d 955 (9th Cir. 2009)..............................................................................................25

*Cal. Trucking Ass'n v. Su*,
  903 F.3d 953 (9th Cir. 2018)..............................................................................................10

*Comcast Corp. v. Behrend*,
  133 S. Ct. 1426 (2013) .......................................................................................................7

*Curry v. CTB McGraw-Hill, LLC*,
  296 F. App'x 563 (9th Cir. 2008) .......................................................................................24

*Dalton v. Lee Publications, Inc.*,
  270 F.R.D. 555 (S.D. Cal. 2010).........................................................................................16

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## TABLE OF AUTHORITIES

(continued)

**Page**

*Day v. AT & T Corp.*
    63 Cal. App. 4th 325 (1998)..................................................................................24

*Desimone v. Allstate Ins. Co.*,
    No. 96-3606, 2000 WL 1811385 (N.D.Cal. Nov. 7, 2000) ....................................15

*Dynamex Operations W. v. Super. Ct.*,
    4 Cal. 5th 903 (2018) ...........................................................................................10

*Ferrington v. McAfee, Inc.*,
    10-cv-01455, 2010 WL 3910169 (N.D. Cal. Oct. 5, 2010) .....................................24

*Gattuso v. Harte-Hanks Shoppers, Inc.*
    42 Cal.4th 554 (2007) ..........................................................................................21

*Global Minerals & Metals Corp. v. Super. Ct.*,
    113 Cal. App. 4th 836 (2003)................................................................................22

*Guifu Li v. A Perfect Franchise, Inc.*,
    No. 5:10-CV-01189-LHK, 2011 WL 4635198 (N.D. Cal. Oct. 5, 2011) ............16, 21

*Gustafson v. BAC Home Loans Serv., LP*,
    294 F.R.D. 529 (C.D. Cal. 2013) ...........................................................................7

*Hanslester Network v. Shalala*,
    51 F.3d 1390 (9th Cir. 1995)................................................................................25

*Harris v. Vector Mktg. Corp.*,
    753 F. Supp. 2d 996 (N.D. Cal. 2010) ..................................................................10

*Harrison v. Wal-Mart Stores, Inc.*,
    613 S.E.2d 322 (N.C. Ct. App. 2005) ....................................................................23

*Hennighan v. Insphere Ins. Sols. Inc.*,
    38 F. Supp. 3d 1083, 1100 (N.D. Cal. 2014) aff'd 650 Fed. Appx. 500 (9th Cir. 2016) ....................................................................................................................15, 18

*Hofstetter v. Chase Home Fin.*,
    No. C-10-01313 WHA, 2011 WL 1225900 (N.D.Cal.2011).....................................7

*In re Barker*,
    839 F3d 1189 (9th Cir. 2016)...............................................................................25

## <u>TABLE OF AUTHORITIES</u>

(continued)

**Page**

*In re First All. Mortg. Co.*,
   471 F.3d 977 (9th Cir. 2006)......................................................................8, 17, 24

*Levine v. Entrust Group, Inc.*,
   No. C 12-03959 WHA, 2012 WL 6087399 (N.D. Cal., Dec. 6, 2012).......................................9

*Marr v. Bank of Am.*,
   No. 09-cv-05978, 2011 WL 845914 (N.D. Cal. Mar. 8, 2011) (Alsup, J.)...............................21

*Martinez v. Flower Foods, Inc.*,
   No. CV 15-5112 RGK (EX), 2016 WL 10746664 (C.D. Cal. Feb. 1, 2016)..........11, 13, 16, 18

*Missions Ins. Co. v. Workers' Comp. Appeals Bd.*,
   176 Cal. Rptr. 439 (Cal. Ct. App. 1981) ...............................................................15

*Mkt. Trading, Inc. v. AT&T Mobility, LLC*,
   388 F. App'x 707 (9th Cir. 2010) .........................................................................25

*Murphy v. Best Buy Stores, L.P.*,
   690 F. App'x 553 (9th Cir. 2017) .........................................................................25

*Narayan v. EGL, Inc.*,
   285 F.R.D. 473 (N.D. Cal. 2012).....................................................................10, 17

*Norris-Wilson v. Delta-T Grp., Inc.*,
   270 F.R.D. 596 (S.D. Cal. 2010)......................................................................16, 22

*O'Connor v. Uber Tech., Inc.*,
   904 F.3d 1087 (9th Cir. 2018).................................................................................8

*O'Connor v. Uber Tech.*,
   No. 13-3826 EMC, 2015 WL 5138097 (N.D. Cal. Sept. 1, 2015)...........................................21

*Parsons v. Ryan*,
   754 F.3d 657 (9th Cir. 2014)....................................................................................9

*Romero v. Producers Dairy Foods, Inc.*,
   235 F.R.D. 474 (E.D. Cal. 2006) .............................................................................7

*Rowe v. Ulta Salon, Cosmetics & Fragrance, Inc.*,
   No. SACV191074PAJCX, 2019 WL 6998780 (C.D. Cal. Aug. 30, 2019) ............................16

*Ruiz v. Affinity Logistics Corp.*,
   No. 05CV2125JLS (CAB), 2009 WL 648973 (S.D. Cal. Jan. 29, 2009) ...............................21

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF AUTHORITIES

(continued)

**Page**

*S.G. Borello & Sons, Inc. v. DIR*,
   48 Cal. 3d 341 (1989) ................................................................................................ passim

*Soares v. Flowers Foods, Inc.*,
   No. 15-cv-04918, 320 F.R.D. 464 (N.D. Cal. 2017)..................................................17

*Sotelo v. MediaNews Grp., Inc.*,
   207 Cal. App. 4th 639 (2012)....................................................................................19

*Spencer v. Beavex, Inc.*,
   No. 05-CV-1501 WQH (WMC), 2006 WL 6500597 (S.D. Cal. Dec. 15, 2006) ....................17

*Staton v. Boeing, Co.*,
   327 F.3d 938 (9th Cir. 2003)......................................................................................22

*Stuart v. RadioShack Corp.*
   641 F. Supp. 2d 901 (N.D. Cal. 2009) .......................................................................21

*Taylor v. Waddell & Reed Inc*.,
   No. 09-02909, 2013 WL 435907 (S.D. Cal. Feb. 1, 2013) .........................................15

*Valentino v. Carter-Wallace, Inc.*,
   97 F.3d 1227 (9th Cir. 1996).......................................................................................7

*Villalpando v. Exel Direct, Inc.*
   303 F.R.D. 588 (N.D. Cal. 2014) ................................................................................16

*Vinole v. Countrywide Home Loans, Inc.*,
   571 F.3d 935 (9th Cir. 2009).......................................................................................7

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ................................................................................................1, 6

*White v. Osmose, Inc.*,
   204 F. Supp. 2d 1309 (M.D. Ala. 2002) ....................................................................23

*Wright v. Gen. Motors Acceptance Corp.*,
   2012 WL 253157 (S.D. Cal. Jan. 25, 2012), *aff'd*, 545 F. App'x 686 (9th Cir.
   2013) ..........................................................................................................................25

*Xavier v. Philip Morris USA, Inc.*,
   787 F.Supp.2d 1075 (N.D.Cal.2011) (Alsup, J.) .......................................................7

### TABLE OF AUTHORITIES

(continued)

**Page**

*Zinser v. Accufix Research Inst., Inc.*,
  253 F.3d 1180 (9th Cir. 2001)..........................................................................................7

**STATUTES**

42 U.S.C. § 1320a-7b(b), *et seq.*........................................................................................25

Civil L.R. 5-1(i)(3)..............................................................................................................12

ERISA...................................................................................................................................24

Labor Code
  § 925.........................................................................................................................8, 9
  § 2750.3.......................................................................................................................19
  § 2750.3(e)....................................................................................................................1
  § 2802.......................................................................................................................1, 21

**RULES**

Rule 23(a)...............................................................................................................................6

Rule 23(a)(2).......................................................................................................................6, 7

Rule 23(a)(3)..........................................................................................................................9

Rule 23(a)(4).........................................................................................................................22

Rule 23(a) and Rule 23(b)(3).................................................................................................2

Rule 23(b)...............................................................................................................................6

Rule 23(b)(3).......................................................................................................................6, 7

**OTHER AUTHORITIES**

*Miriam-Webster Online Dictionary*,
  https://www.merriamwebster.com/dictionary/and....................................................8

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

## I. __INTRODUCTION__

2   Plaintiff James Karl argues that a common question exists as to whether he and nearly 300

3   other medical device sales representatives in California were misclassified as independent

4   contractors.  As the Supreme Court precedent in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338

5   (2011) and its progeny dictate, however, a plaintiff seeking class certification must not only pose

6   a common question, but also must establish that the evidence will produce a "*common answer*" to

7   this question.  Here, the evidence before the Court, including declarations and testimony from

8   sales representatives, demonstrates that the answer to the classification question may be different

9   depending upon each sales representative's particular circumstances.  Pursuant to the standard

10  established in *S.G. Borello & Sons, Inc. v. DIR*, 48 Cal. 3d 341 (1989), determining whether a

11  person is correctly classified as an independent contractor requires a fact-finder to engage in a

12  detailed multi-factor analysis. The evidence relevant to each of the *Borello* factors, including the

13  primary factor of "control," varies significantly between sales representatives and demonstrates

14  that individualized inquiries will predominate and a class trial would be unmanageable.

15  Contrary to Plaintiff's argument, merely looking to the various signed agreements and

16  policy documents will not provide a common answer. Notably, this Court denied Defendants'

17  summary judgment motion as to Karl's Labor Code §2802 expense reimbursement claim because

18  "a reasonable jury could reach different conclusions in applying the multi-factored [*Borello*] test"

19  (Dkt. 127, 11:20-21).  This Court also has denied class certification in the analogous context of

20  exempt misclassification where, despite putative class members being subject to uniform

21  contracts and policies, liability ultimately depended on their individual work experiences.

22  *Akaosugi v. Benihana Nat'l. Corp.,* 282 F.R.D. 241, 251-52 (2012) (J. Alsup).

23  Individualized issues also will predominate for the period post-January 1, 2020, because

24  determining whether to apply the *Borello* test will itself require a multi-factor analysis under the

25  statutory "business-to-business exception" to the "ABC Test" set forth in Labor Code §2750.3(e).

26  Thus, post-January 1, 2020, there is no "common answer" even as to which test the Court should

27  apply to determine a particular sales representative's classification. Any trial would devolve into

28  a series of fact-intensive mini-trials (not only as to the question of contractor status, but also as to

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

MPAS ISO DEFS.' OPP'N TO CLASS CERT.
Case No. 3:18-cv-04176-WHA

DB2/ 38870649.9

1   the underlying legal claims for expense reimbursements and ability to recover restitution under

2   the UCL). Plaintiff has failed to prove each of the requisite elements for class certification under

3   Rule 23(a) and Rule 23(b)(3), and as a result the Court should deny Plaintiff's Motion.

## II.    STATEMENT OF RELEVANT FACTS[1]

### A.    The One-Year Period Prior to the Merger of Zimmer and Biomet

Plaintiff seeks to certify a class commencing July 12, 2014, which is four years before he

filed the complaint.  Up until June 2015, however, Zimmer US, Inc. and Biomet U.S.

Reconstruction, LLC were unrelated entities and, in fact, competed with each other in the medical

device industry.  Ritter Decl. ¶ 3.  Biomet U.S. Reconstruction, LLC contracted with persons to

sell devices in central California.  *Id*. at ¶ 4.[2]  Zimmer US, Inc. separately contracted with persons

to sell devices in southern California. Holdsworth Decl. ¶ 3. Because Zimmer and Biomet were

separate companies, they each used their own independent contractor agreements that differed in

material ways.  *See, e.g.,* Holdsworth Decl. Ex. A; Ritter Decl. Ex. A.  Notably, Plaintiff Karl

never contracted with either pre-merger entity.  Karl Depo. 66:9-16 ("[prior to merger] I had

never been in contract with either Zimmer or Biomet directly.")

### B.    The Zimmer-Biomet Merger and California Territory Structure

In June 2015, Zimmer and Biomet merged. Thereafter, Zimmer US, Inc., Biomet U.S.

Reconstruction, LLC, and Biomet Biologics (collectively, "Zimmer Biomet") together began

directly contracting with independent contractors in California to sell medical devices and

biologics products focused on knees, hips, sports medicine, foot and ankle, extremities, and

trauma.  Ritter Decl. ¶ 5.  Zimmer Biomet contracted in three territories, called ZB Bay Area, ZB

Southern California, and ZB Pacific, and in each territory, Zimmer Biomet employed at least one

Territory General Manager ("TGM") and other administrative personnel.  *Id*. ¶ 6.

Since the merger, Zimmer Biomet has used different contracts with sales representatives

in California.  Ritter Decl. ¶ 7. Some of the differences in these contracts included the following:

---

[1] Declarations are cited as "[declarant's last name] Decl. [page] : [lines]" and deposition
testimony is cited as "[deponent's last name] Depo. [page] : [lines]." All declarations and
deposition testimony (and corresponding Exhibits) are identified and attached to the Index of
Declarations filed concurrently herewith.
[2] Prior to the merger, Defendant Biomet Biologics, LLC did not contract with any sales
representatives in California.  *Id*. at ¶ 4.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 38870649.9

2

MPAS ISO DEFS.' OPP'N TO CLASS CERT.
Case No. 3:18-cv-04176-WHA

(1) the 2015-2017 versions permitted Zimmer Biomet to terminate the contract if the contracting sales representative failed to meet certain sales goals; later versions did not allow this (ECF# 53-1, Exs. 24, 25, 26 vs. ECF# 53-1, Exs. 27, 28);

(2) the 2015 version provided that upon termination, the contracting sales representative shall "assign to Company all telephone numbers and e-mail accounts used in connection with Representative's business;" later versions did not require this (ECF# 53-1, Ex. 26 vs. ECF# 53-1, Exs. 24, 25, 27, 28);

(3) in 2018, sales representatives were required to notify their TGM of alleged discrepancies in compensation within 30 days of any inaccurate payment; prior versions did not require this (ECF# 53-1, Ex. 28 vs. ECF# 53-1, Exs. 24, 25, 26, 27); and

(4) while each contract included a schedule of "Payment Deduction Guidelines," the specific types of expenses reimbursed differed, *e.g.*, prior to 2018, Zimmer Biomet did not charge sales representatives a monthly "Technology Fee (SMS, Email Domain, etc.)" (ECF# 53-1, Exs. 24, 27, 28 vs. Exs. 25, 26).[3]

Sales representatives could, and several did, negotiate certain terms of their contracts. Senne Depo. 60:24-61:3 ("Q: So when you asked for a higher commission percentage, you and Scott Holdsworth [ZB Southern California TGM] talked about it, and agreed to a $5,000 flat bonus, is that correct? A: Yes."); Kato Depo. 125:10-15 ("Conversations with Don [Quigley, ZB Bay Area TGM] and the teammates themselves. There was constantly negotiations going on. Q: What kinds of negotiations?  A: Everyone always wanted more -- higher percentage.  Q: And were you involved in these negotiations? A: In my personal percentage, yes.").[4]

Zimmer Biomet did not control, dictate or monitor how the sales representatives performed their sales duties or what they did on a daily basis.  *See e.g.,* Brian Marshall ¶ 25 ("As an independent contractor sales representative operating through my independently established S-corporation, I am free from the control and direction of Zimmer Biomet in connection with the performance of my work, including under the Agreement and in actuality.").[5] Sales

---

[3] Plaintiff concedes the post-merger agreements contain different terms. *See* Dkt 142 at FN 4 and 8 (noting differences in the grounds for terminating the Agreement and Zimmer Biomet's rights upon termination), and FN 5 and 9 (noting differences in the non-compete clauses). He does not even address the pre-merger agreements.

[4] *See also, e.g.,* Holdsworth Decl. ¶ 9; Karl Depo. 73:4-8; Kato Depo. 36:20-37:5; Quigley Decl. ¶ 16; Ritter Decl. ¶ 7; Siqueiros Decl. ¶ 8.

[5] *See also* Baker Decl. ¶ 9; Ceccarelli Decl. ¶ 5; Ewing Decl. ¶ 11; Guin Decl. ¶ 7; Kowalski Decl. ¶ 10; McMahon Decl. ¶¶ 5, 6; Neill Decl. ¶ 10; Nielsen Decl. ¶11; Ritter Decl. ¶ 10; Sabourin Decl. ¶ 7; Siqueiros Decl. ¶ 4; Totemeier Decl. ¶ 7.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 38870649.9

3

MPAS ISO DEFS.' OPP'N TO CLASS CERT.
Case No. 3:18-cv-04176-WHA

1   representatives did not report to a Zimmer Biomet office; instead, performing their sales activities

2   from home, on the road, in doctor's offices, hospitals, etc.[6]  Sales representatives decided for

3   themselves when, where and how best to sell to their surgeon customers. *See e.g.,* Kowalski Decl.

4   ¶ 12 ("Zimmer Biomet does not control my choices to make investments in my own business one

5   way or the other.  If I wanted to invest more in advertising or marketing, such as taking more

6   surgeons to lunch, or choosing whom to take to lunch, I decide that, not Zimmer Biomet.

7   Whether I turn a profit or take a loss is really up to me and the amount of effort and skill I use to

8   increase sales in my region, Zimmer Biomet doesn't control that.  I have the latitude to sell the

9   way I want to sell").[7]

10          Whether sales representatives communicated with each other, the frequency with which

11   they did so, and the methods they used were 100% decided by the representatives themselves, not

12   Zimmer Biomet.[8]  For example, representatives communicated with each other using different,

13   non-Zimmer Biomet monitored or controlled applications, such as Google Calendar, Microsoft

14   Word, Trumba, WhatsApp, and/or group text messaging.[9]  Zimmer Biomet did not have access to

15   the representatives' calendars or communications.[10]  Indeed, some sales representatives met or

16   spoke with their TGM only "once every three or four months" (Kato Depo. 77:2-9) or "once a

17   quarter maybe" (Andrews Depo. 40:19-25).  Zimmer Biomet did not require sales representatives

18   to keep or submit "sales call logs" or any other reports on their daily sales-related or personal

19   activities.[11]

20

21   ────────────────

[6] *See* Ceccarelli Decl. ¶ 15; Guin Decl. ¶ 7; Ewing Decl. ¶ 11; Holdsworth Decl. ¶ 17; Kowalski
22   Decl. ¶ 10; Neill Decl. ¶ 13; Nielsen Decl. ¶ 18; Ritter Decl. ¶ 12; Sabourin Decl. ¶ 27; Siqueiros
     Decl. ¶ 23; Totemeier Decl. ¶ 19; Quigley Decl. ¶ 9.
23   [7] *See also* Baker Decl. ¶ 9; Ceccarelli Decl. ¶ 5; Ewing Decl. ¶ 11; Guin Decl. ¶ 12; Karl Depo.
     228:14-230:2; Neill Decl. ¶ 15; Nielsen Decl. ¶ 5; Marshall Decl. ¶ 17; McMahon Decl. ¶ 5;
24   Ritter Decl. ¶ 10; Sabourin Decl. ¶ 12; Siqueiros Decl. ¶ 12; Totemeier Decl. ¶ 10.
     [8] *See* Sabourin Decl. ¶ 16; Marshall Decl. ¶ 20; McMahon Decl. ¶ 7; Nielsen Decl. ¶ 7; Sabourin
25   Decl. ¶ 16; Siqueiros Decl. ¶ 15; Totemeier Decl. ¶ 4.
     [9] *See* Andrews Depo. 68:10-17; Baker Decl. ¶ 9; Holdsworth Decl. ¶¶ 42, 53; Kato Depo. 65:7-
26   17; Martin Decl. ¶¶ 10, 14; McMahon Decl. ¶ 7; Nielsen Decl. ¶ 7; Quigley Decl. ¶¶ 38, 48, 65,
     78; Senne Depo. 87:17-18; Sabourin Decl. ¶ 15; Siqueiros Decl. ¶ 17; Totemeier Decl. ¶ 4.
27   [10] *See* Andrews Depo. 68:21-69:1; Holdsworth Decl. ¶ 33; Marshall Decl. ¶ 20; McMahon Decl. ¶
     7; Nielsen Decl. ¶ 7; Quigley Decl. ¶ 23; Siqueiros Decl. ¶ 17; Totemeier Decl. ¶ 4.
28   [11] *See* Andrews Depo. 67:17-68:9; Baker Decl. ¶ 9; Ceccarelli Decl. ¶ 5; Ewing Decl. ¶ 11; Guin
     Decl. ¶ 7; Marshall Decl. ¶ 17; McMahon Decl. ¶ 6; Neill Decl. ¶ 11; Nielsen Decl. ¶ 12; Senne
     Depo. 91:18-22; Sabourin Decl. ¶ 19; Siqueiros Decl. ¶ 4; Totemeier Decl. ¶ 3.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 38870649.9

4

MPAS ISO DEFS.' OPP'N TO CLASS CERT.
Case No. 3:18-cv-04176-WHA

Some sales representatives were part of sales "teams,"[12] while others sold (and were compensated) independent of any team.[13] Some sales representatives (including Karl) volunteered to serve as "Team Leaders," and had different duties than other sales representatives.[14] Some representatives felt controlled by, and had conflicts with, their Team Leaders. Baker Depo. 274:21-275:3.

### C.   Plaintiff James Karl

On August 10, 2015 (after the merger), Karl signed a Zimmer Biomet Sales Associate Agreement ("SAA") that classified him as an independent contractor. Dkt. 53-1, Ex. 13, ¶ 2(a). He negotiated certain terms of his relationship prior to signing the SAA. Quigley Decl. ¶ 30.

Prior to contracting with Zimmer Biomet, Karl voluntarily chose to establish a corporate business, JWK Management, Inc., and a limited liability company, Edge Medical, LLC, in order to operate his medical sales business. Karl Depo. 239:19-22; 242:17-243:22; 246:2-24; Ex. 1016. Karl chose to receive a salary from Edge Medical. *Id.* at 250:9-18. Zimmer Biomet did not issue tax documents to Karl because it paid commissions to his business, Edge Medical. *Id.* at 240:8-25; 252:25-254:4; Ex. 1013. Edge Medical had its own business bank account and credit card separate from Karl's personal accounts. *Id.* at 241:25-242:16; 246:25-247:15; 304:11-23; Exs. 1015, 1017. Edge Medical paid all expenses Karl incurred performing duties for Zimmer Biomet and for other companies. *Id.* at 241:25-242:16, Ex. 1015. JWK Management and Edge Medical filed and paid their own business taxes separate from Plaintiff's personal taxes. *Id.* at 245:10-246:1. Karl's businesses took tax deductions for the expenses incurred selling products for Zimmer Biomet and for other companies. Karl Depo. 243:7-16.

Karl used his personal jim.karl@gmail.com to email Zimmer Biomet and customers. Karl Depo. 232:11-233:17. He was not required to have or use ZB business cards. *Id.* at 232:8-10.

During the period Karl sold Zimmer Biomet products, he also contracted with and sold products for numerous other medical device companies (including some direct competitors of

---

[12] *See* Ceccarelli Decl. ¶ 10; Ewing Decl. ¶ 6; Kato Depo. 32:16-17; Marshall Decl. ¶ 15; McMahon Decl. ¶ 6; Neill Decl. ¶ 11; Nielsen Decl. ¶ 3; Sabourin Decl. ¶ 3; Senne Depo. 55:11-13, 56:5-10; Siqueiros Decl. ¶ 4; Totemeier Decl. ¶ 3.

[13] *See* Stottle Depo. 51:25-52:4; Baker Decl. ¶ 6; Guin Decl. ¶ 5; Holdsworth Decl. ¶ 12; Kowalski Decl. ¶ 9; Quigley Decl. ¶ 5.

[14] Kato Depo. 63:5-6; Karl Depo. 122:23-25; Ewing Decl. ¶6; Guin Decl. ¶8; Marshall Decl. ¶ 15.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 38870649.9

5

MPAS ISO DEFS.' OPP'N TO CLASS CERT.
Case No. 3:18-cv-04176-WHA

1  Zimmer Biomet) through his Edge Medical business. *Id*. at 263:11-280:16 Exs. 1022-1032.

2  Under his SAA, Karl had the discretion to hire or otherwise retain other persons to help him

3  perform his sales duties. Ex. 1001, ¶¶ 2, 6(g); ECF 53-1 Ex. 13. Karl did contract with other

4  persons, without any involvement by Zimmer Biomet, and paid them to assist with coverage,

5  cleaning, and other tasks. Karl Depo. at 143:23-144:10; 144:23-145:1; 146:16-148:21; 152:2-5.

6      Karl initially served as a Team Leader on "Team Golden Gate" but unilaterally chose to

7  step down from this role. Karl Depo. 79:21-80:3; 81:16-19; 123:1-11.  Plaintiff also unilaterally

8  decided to remove himself from his Team's on-call schedule. *Id*; *also* at 255:17-256:8; Ex. 1011.

9      Karl's SAA has not terminated since he entered into it.  Meckley Decl. ¶ 5, Ex. D (RFA

10  No. 4).  But in 2016, Karl unilaterally decided to stop selling under his Zimmer Biomet SAA, and

11  instead sell for a third-party distributor.  Karl Depo. 88:25-90:9. During that time, he did not

12  contact his TGM or incur expenses under his SAA.  In early 017, Karl decided to reverse course

13  and resumed selling under his Zimmer Biomet SAA. *Id*. at 110:25-113:13.

14  **III.**   **LEGAL ARGUMENT**

15      A plaintiff seeking class certification must prove all requirements of Rule 23(a) and one

16  element under Rule 23(b).  *Abdullah v. U.S. Sec. Assocs., Inc*., 731 F.3d 952, 956–57 (9th Cir.

17  2013).  Under Rule 23(a), a plaintiff must prove: (1) numerosity; (2) common questions of law or

18  fact; (3) typicality; (4) adequacy.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613–14 (1997).

19  As to "commonality," Plaintiff must do more than argue all class members "have all suffered a

20  violation of the same provision of law."  *Wal-Mart Stores, Inc.*, 564 U.S. at 350.  Instead, Rule

21  23(a)(2) requires Plaintiff to show that there will be "common answers apt to drive the resolution

22  of the litigation.  Dissimilarities within the proposed class are what have the potential to impede

23  the generation of common answers."  *Id.* (quoting Richard A. Nagareda, *Class Certification in the

24  Age of Aggregate Proof*, 84 N.Y.U.L.Rev. 97, 131–132 (2009)).

25      Rule 23(b)(3) requires the Court find "the questions of law or fact common to class

26  members predominate over any questions affecting only individual members, and that a class

27  action is superior to other available methods for fairly and efficiently adjudicating the

28  controversy."  Under Rule 23(b)(3), the Court must consider four non-exclusive factors in

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 38870649.9

6

MPAS ISO DEFS.' OPP'N TO CLASS CERT.
Case No. 3:18-cv-04176-WHA

evaluating whether a class action is a superior method of adjudicating the claims: (1) the interest of each class member in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against the class; (3) the desirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action. *See Zinser v. Accufix Research Inst., Inc*., 253 F.3d 1180 at 1190-92 (9th Cir. 2001).  The predominance standard is "even more demanding" (*Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013)) and "much more rigorous" (*Amchem Prods., Inc.*, 521 U.S. at 623-24) than Rule 23(a)(2)'s commonality requirement.  The predominance analysis looks to whether adjudication of common issues "will help achieve judicial economy," further the goal of efficiency, and "diminish the need for individual inquiry."  *See Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935 at 939, 944 (9th Cir. 2009); *see also Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) ("Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy.").  This Court must vigorously and pragmatically evaluatre whether the central issues in the action predominate over issues particular to individual class members. *Romero v. Producers Dairy Foods, Inc.*, 235 F.R.D. 474, 489 (E.D. Cal. 2006); s*ee also Gustafson v. BAC Home Loans Serv., LP*, 294 F.R.D. 529, 542 (C.D. Cal. 2013).  When attempting to determine the correct legal classification of putative class members would present a quagmire of individual questions, certification should be denied. *See Fjeld*, 2013 WL 8360535, at *5 (denying certification for allegedly misclassified employees for failing to meet *Dukes'* "common answer" test).

A.   **The Court Should Not Certify a Class For the Period Prior to the Merger.**

1.   **The Class Definition By Its Terms Excludes the Pre-Merger Period.**

An implied prerequisite to class certification is that the class must be sufficiently definite with parameters set by objective criteria and determinable from defendant's business records. *Xavier v. Philip Morris USA, Inc.,* 787 F.Supp.2d 1075, 1089 (N.D.Cal.2011) (Alsup, J.); *Hofstetter v. Chase Home Fin.,* No. C-10-01313 WHA, 2011 WL 1225900, at *12, 14 (N.D.Cal.2011).  Here, Karl expressly defines the proposed class as:

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 38870649.9

7

MPAS ISO DEFS.' OPP'N TO CLASS CERT.
Case No. 3:18-cv-04176-WHA

1
2
3

"Any person who, during the period commencing four years prior to the date of this lawsuit to the present, *was hired or otherwise engaged* as an independent contractor for the purposes of solicitation or sales of Zimmer Biomet products and/or services in California *by* ZIMMER US, INC., BIOMET U.S. RECONSTRUCTION, LLC, *and* BIOMET BIOLOGICS, LLC." Motion at 12:16-19 (emphasis added).

4
5
6
7
8
9
10
11

Plaintiff's use of the word "and" defined Defendants *conjunctively*. The word "and" means "a logical operator that requires both of two inputs to be present or two conditions to be met for an output to be made or a statement to be executed." *Miriam-Webster Online Dictionary*, https://www.merriamwebster.com/dictionary/and. Zimmer and Biomet were competitors before June 24, 2015, and collectively did not engage anyone as an independent contractor. Only after the merger were sales representatives "*engaged . . . by*" Zimmer US, Inc, Biomet US Reconstruction, LLC *and* Biomet Biologics, LLC. The class definition thus encompasses only those persons who contracted directly with *all* of these three entities *after* the merger.

12

### 2. This Court Lacks Jurisdiction As to the Pre-Merger Time Period.

13
14
15

The contracts used by the "legacy" companies prior to the merger contain provisions that preclude this Court from exercising jurisdiction over persons who signed those contracts. Specifically, the pre-merger Biomet agreements contain enforceable arbitration provisions:

16
17
18
19
20
21

Dispute Resolution. If any matter involving claims and/or disputes or other questions arising out of, or relating to this Agreement or to a breach hereto or default hereunder cannot be settled by mutual agreement within thirty (30) days following notice by one party to the other that such party deems a claim, dispute, question, breach or default to have arisen hereunder, such matter shall be settled by arbitration in accordance with the then current CPR Non-Administered Arbitration Rules, by a sole arbitrator. The arbitration shall be governed by the United States Arbitration Act, 9 U.S.C. §§1-16, and judgment upon the award rendered by the arbitrator may be entered by any court having jurisdiction thereof.

22
23
24
25
26
27
28

Ritter Decl. ¶ 4, Ex. A. The import of this provision is that pre-merger Biomet contractors must be excluded from any class. *O'Connor v. Uber Tech., Inc.*, 904 F.3d 1087, 1094 (9th Cir. 2018) (overturning the class certification decision because the class included drivers with arbitration agreements). The pre-merger Biomet agreements also contain an Indiana forum-selection clause. Although this Court found that the Indiana forum selection clause in the *post*-merger Zimmer Biomet contract was unenforceable under Labor Code section 925 (Dkt 27), section 925 applies *only* to contracts entered into or modified after January 1, 2017. The pre-merger contracts were

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 38870649.9

8

MPAS ISO DEFS.' OPP'N TO CLASS CERT.
Case No. 3:18-cv-04176-WHA

1    entered into prior to the 2015 merger and never modified thereafter (because of the merger), thus

2    section 925 does not apply to these contracts.  The pre-merger Zimmer contracts contain a

3    *different* forum selection clause requiring claims be resolved in the Central District of California

4    or Orange County Superior Court.  Holdsworth Decl. ¶ 5, Ex. A; Martin Decl. ¶ 3, Ex. A.  Section

5    925 has no application to this legacy Zimmer forum selection clause because it requires venue

6    within California (Orange County or the Central District).  *Levine v. Entrust Group, Inc.*, No. C

7    12-03959 WHA, 2012 WL 6087399, at *4 (N.D. Cal., Dec. 6, 2012) ("even in California, a valid

8    forum-selection clause will be enforced notwithstanding the plaintiffs' desire to sue on behalf of

9    others") (citation omitted).  Thus, this Court lacks jurisdiction over pre-merger period claims.[15]

10                    **3.**      **Karl Lacks Typicality As To the Pre-Merger Time Period.**

11                   Under Rule 23(a)(3) Karl must prove his claims "are typical of the claims or defenses of

12   the class." This requirement tests whether he and members of the class "have the same or similar

13   injury, whether the action is based on conduct which is not unique to the named plaintiffs, and

14   whether other class members have been injured by the same course of conduct." *Parsons v. Ryan*,

15   754 F.3d 657, 685 (9th Cir. 2014).  Here, Karl did not contract with either Zimmer or Biomet

16   prior to the merger; he sold for a third-party distributor. The contract Karl signed post-merger was

17   materially different from either "legacy" entity's contract with respect to both the arbitration and

18   forum selection provisions described above, as well as in other material ways.[16]  Karl's claims are

19   not "typical" to those persons who contracted with either Zimmer or Biomet prior to the merger.

20           **B.**      **The Court Should Not Certify a Pre-January 1, 2020 "Misclassification**
                        **Class".**
21
22                   Under *S. G. Borello & Sons, Inc.*, 48 Cal. 3d 341, 350 (1989), "[t]he principal test of an

23   employment relationship is whether the person to whom service is rendered has the right to

---

[15] Given the different terms, this Court will need to conduct an "independent legal analysis" of
each agreement. *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1069 (9th Cir. 2014) (common
questions shared by the class do not predominate over individual questions raised by the need to
interpret five agreements).

[16] For example, (a) pre-merge Zimmer deemed representatives business entities, while pre-merger
Biomet agreements did not; (b) pre-merger Zimmer agreements prohibited sales representatives
from assigning duties or responsibilities "to any employee, agent, representative, or independent
contractor," while pre-merger Biomet agreements did not; (c) pre-merger Zimmer agreements
barred concurrently selling of other products, while pre-merger Biomet agreements limited only
sales of competing products. *Compare* Holdsworth Decl. Ex. A with Ritter Decl. Ex. A.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 38870649.9                              9                    MPAS ISO DEFS.' OPP'N TO CLASS CERT.
                                                                  Case No. 3:18-cv-04176-WHA

1   control the manner and means of accomplishing the result desired[.]" *Id.* at 350 (internal

2   quotation marks omitted).[17]

3          Here, Plaintiff has posed a supposed "common" question – whether "Zimmer legally

4   classified Sales Representatives as independent contractors" – but failed to show such question

5   can be answered for each sales representative in one fell swoop using common proof and

6   evidence. *See, e.g., Vinole,* 571 F.3d 935 at 939, 944 (a uniform classification decision does little

7   to further the assessment of the relationship between individual and common issues).

### 1.   Defendants' Contracts and Policies Do Not Provide a Common Answer to the Misclassification Question.

9          This Court has recognized that uniform policies "do not eliminate the need to make a

10  factual determination as to whether class members are actually performing similar duties."

11  *Akaosugi,* 282 F.R.D. at 251.  The California Supreme Court in *Ayala v. Antelope Valley*

12  *Newspapers, Inc.,* 59 Cal. 4th 522, 535 (2014) confirmed that "[w]hile any written contract is a

13  necessary starting point . . . the rights spelled out in a contract may not be conclusive if other

14  evidence demonstrates a practical allocation of rights at odds with the written terms."  Defendants

15  can establish "an independent contractor relationship . . . by showing that in actual practice no

16  control was exercised, and that the parties acted under the contracts and interpreted them so as not

17  to give [Defendants] the right of control."  *Bemis v. People*, 109 Cal. App. 2d 253, 264 (1952);

18  *Harris v. Vector Mktg. Corp.*, 753 F. Supp. 2d 996, 1021 (N.D. Cal. 2010) ("[T]he control that is

19  actually exercised may be informative of the control that may be exercised."); *Narayan v. EGL,*

20  *Inc.*, 285 F.R.D. 473, 480 (N.D. Cal. 2012) ("The evidence shows that, while they may have each

21  interacted on the same terms with defendants, class members were situated very differently in

22  their operations . . . [T]he issues that must still be resolved in order to adjudicate the class claims,

23  the court finds that common questions do not predominate.")

24         Here, Plaintiff has failed to establish that a class-wide answer exists as to *Borello's*

25  principal inquiry whether defendant has the right to control the manner and means of

---

[17] In 2018, the California Supreme Court in *Dynamex Operations W. v. Super. Ct.*, 4 Cal. 5th 903 (2018) ruled that the "ABC test" would apply to determine employee status for claims based on Industrial Welfare Commission Wage Orders, however, the Ninth Circuit confirmed that the *Borello* test continued to apply for claims *not* based on wage orders.  *See Cal. Trucking Ass'n v. Su*, 903 F.3d 953, 958 (9th Cir. 2018).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 38870649.9

10

MPAS ISO DEFS.' OPP'N TO CLASS CERT.
Case No. 3:18-cv-04176-WHA

1   accomplishing the result desired. Plaintiff argues that the contracts "show what independent

2   contractors actually do day to day" based on the "Duties and Obligations" in Section 6. Motion at

3   5:2-6.  But, he fails to explain how such generic terms provide Defendants' with control over the

4   manner and means by which sales representatives perform their primary duty -- *i.e.*, increasing

5   sales of medical devices to doctors. The contracts here are analogous to the generically worded

6   contracts in *Martinez v. Flower Foods, Inc.,* No. CV 15-5112 RGK (EX), 2016 WL 10746664

7   (C.D. Cal. Feb. 1, 2016), in which the court found the question of control was not amenable to

8   class-wide proof.  In *Martinez,* the plaintiff relied on a uniform distributor contract applicable to

9   all putative class members, but the court found that none of the contract's terms demonstrated

10  defendants' right to control.  *Id.* at *11.  For example, the court found the contract's "Good

11  Industry Practice" provision was an "immensely broad standard that does not actually mandate

12  any specific behavior," but rather "merely sets forth a general framework within which variations

13  abound depending on the practical reality in a given situation."  *Id.*  The court also found the

14  contract's "broad standard" that class members "maintain[ ] proper service and delivery ... in

15  accordance with [the customer's] requirements . . . does not delineate the specific conduct that

16  drivers must follow, nor does it demonstrate Defendants' supposedly vast and uniform control

17  over class members."  *Id.*

18       Here, the "Duties and Obligations" in sales representatives' contracts do not dictate or

19  control their specific conduct each day, but merely require them "to exercise best efforts to

20  aggressively market and sell the Products in the Territory" (SAA ¶ 6(a)). The evidence shows

21  that, on a practical level, sales representatives dictate and control their own sales duties, not

22  Zimmer Biomet. *See e.g.,* Sabourin Decl. ¶ 7 ("My sales associate agreement does not even

23  address, let alone control, what Zimmer Biomet devices that I can sell, or how I choose to sell

24  them, or to whom."); Totemeier Decl. ¶ 10 ("My Sales Associate Agreement with Zimmer does

25  not address where, what and how I go about the most effective ways of selling Zimmer

26  products.")  Sales representatives make their own decisions and use their own judgment about the

27  most effective sales techniques and strategies on a day-by-day basis. Norsigian Decl. ¶ 21 ("I

28  function autonomously, from initiating relationships with surgeons and hospital staff to finalizing

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 38870649.9

11

MPAS ISO DEFS.' OPP'N TO CLASS CERT.
Case No. 3:18-cv-04176-WHA

sales."); Totemeier ¶ 7 ("Zimmer does not control how, when or where I make sales calls.  I make these decisions based on my familiarity with the physicians and surgeons in my territory.").

Many sales representatives, like Karl himself, sold other companies' products while also selling Defendants' products.[18]  One of Plaintiff's declarants admitted earning *more* compensation selling for other companies.  Stottle Depo. 49:16-21 ("Q: So just so I'm clear and then we can move on, the money, the income you got from Breg on a monthly basis was more than the money you got from Zimmer; is that right? A: Yes.").[19]

Plaintiff's assertion that Zimmer Biomet "had tight rein on their work activities" and imposed "strict controls on how products are marketed" is flatly contradicted by the evidence, including testimony from Plaintiff's own declarants:

> Q: Did Zimmer Biomet have any additional requirements about marketing materials that you gave to doctors than what the law required?
> A: No.   Senne Depo. 66:11-19.
>
> Q: Is there anything that you are aware of that Zimmer Biomet did to prevent you from advertising or marketing in a way that you thought would help your sales?
> A: No, there's nothing that they did that would prevent me from marketing, I don't believe so.   Andrews Depo. 91:25-92:5.

One of Plaintiff's declarants chose to increase sales by entertaining surgeons on his boat. Senne Depo. 80:20-22. Another declarant created his own website. Stottle Depo. 32:21; Meckley Decl. ¶ 9, Ex. H.  Some sales representatives chose to offer discounts to surgeons.  Ewing Decl. ¶ 10 ("The [TGM] provides me with a list of the market prices for the devices that I sell.  I can decide whether I want to sell a product at the market-set price or offer a discount to the customer.").  Indeed, the only marketing limitations came from governmental regulatory guidelines prohibiting off-label promotion of FDA-approved products.[20] *See e.g.,* Totemeier Decl.

---

[18] *See* Kowalski Decl. ¶ 4 ("[O]nly about 60-70% of my overall income comes from selling for Zimmer Biomet. About 30-40% of my income comes from selling products as an independent contractor distributor for other medical device companies."); Ewing Decl. ¶ 8; Ceccarelli Decl. ¶ 9; Totemeier Decl. ¶ 11; Sabourin Decl. ¶ 22; Ewing Decl. ¶ 8; Guin ¶ 11; McMahon Decl. ¶ 13; Baker Decl. ¶17; McMahon Decl. ¶ 13; Neill Decl. ¶ 6; Kowalski Decl. ¶ 4.

[19] Notably, Plaintiff's putative class member declarants used improper electronic signatures because they do not include a filer's attestation of the declarants' signatures as required by Civil L.R. 5-1(i)(3), thus Defendants request that Plaintiff's declarations be stricken as a result of this violation. Defendants also object to these declarations and request they be excluded based on lack of foundation and contradictions with deposition testimony. *See* Meckley Decl. ¶ 11, Ex. J.

[20] *See* Ritter Decl. ¶ 17; Baker Decl. ¶ 16.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 38870649.9

12

MPAS ISO DEFS.' OPP'N TO CLASS CERT.
Case No. 3:18-cv-04176-WHA

1    ¶ 8 ("Because the government heavily regulates the advertisement and marketing of medical

2    devices, I choose not to do any type of my own advertising or marketing of Zimmer products

3    because, in my opinion, the benefit to me is not worth the risk of potentially violating any

4    government regulations"); Siqueiros Decl. ¶ 22 ("I can market and sell to surgeons however I

5    want, so long as I abide by all compliance laws and regulations from the federal and state

6    governments.")[21]   Sales representatives, like Karl himself, could use their own personal email

7    addresses for Zimmer Biomet sales-related work.[22]  Also, sales representatives admitted not being

8    required to have or use Zimmer Biomet business cards.[23]

9         Plaintiff argues that Defendants controlled sales representatives by requiring them to

10   record surgeries in the "Surgery Management System" ("SMS").  However, SMS does not track

11   daily activities or sales meetings, but rather serves to notify Zimmer Biomet of the need to deliver

12   medical devices to a healthcare facility for use in a surgery.  Norsigian Decl. ¶ 18; Quigley Decl.

13   ¶ 56.  Zimmer Biomet uses the information in SMS to determine what devices were used in a

14   surgery.  Quigley Decl. ¶ 56; Senne Depo. 59:11-17 ("Q: Did you ever want to use a different

15   program than SMS for inventory tracking purposes? A: No. Q: Did you understand that Zimmer

16   Biomet had a legal obligation to know where its inventory was located?  A: Yes.")  Use of a

17   product tracking system like SMS is not evidence of control, especially given evidence that some

18   sales representatives rarely used it.  Norsigian Decl. ¶ 18 ("I recall that Tanner Senne rarely

19   booked cases himself, so he would not have had any need to use SMS that often."). *Martinez,*

20   2016 WL 10746664, at *12 ("while the Distributor Agreement requires drivers to use handheld

21   devices that transmit sales data, nothing in the contract specifies that Defendants have any right to

22   control drivers through supervision or monitoring.").

23        The evidence also shows that sales representatives are not required to submit on-call

24   _____

     [21] Neill Decl. ¶ 10 ("I do not pursue any advertising, because I find that everyone in my territory
25   knows the Zimmer Biomet product brand."); Baker Decl. ¶ 16; Kato Depo. 72:4-18; Senne Depo.
     67:5-20 ("Q: Are you connected with any of the surgeons that you sold to for Zimmer Biomet on
26   social media? A: Yes … Q: As a sales representative of Zimmer Biomet, did they prohibit you
     from contacting these doctors via social media?  A: No.")
     [22] *See* Guin Decl. ¶ 15; Totemeier Decl. ¶ 17; Quigley Decl. ¶ 12; Guin Decl. ¶ 15; Baker Decl. ¶
27   13; Kowalski Decl. ¶ 11; Sabourin Decl. ¶ 24; Siqueiros Decl. ¶ 26.
     [23] *See* Senne Depo. 65:15-17; Totemeier Decl. ¶ 17; Sabourin Decl. ¶ 25; Ewing Decl. ¶ 12; Neill
28   Decl. ¶ 14; Baker Decl. ¶ 14; Neill Decl. ¶ 14; Andrews Depo. 43:23-25.; Ceccarelli Decl. ¶ 14;
     Sabourin Decl. ¶ 25; Quigley Decl. ¶ 13; Siqueiros Decl. ¶ 27.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 38870649.9                                    13                    MPAS ISO DEFS.' OPP'N TO CLASS CERT.
                                                                         Case No. 3:18-cv-04176-WHA

schedules, meeting schedules, or sales call logs to Defendants.[24]  They also have control over their own schedules and decide, for example, whether to work weekends, when to take vacation and personal days, and whether they wanted another sales representative to cover a surgery for them.[25]  Plaintiff's declarants' testimony also contradicted many of the supposed indicia of control described in their declarations. For example, Mr. Kato declared he "had no say in choosing [Team Golden Gate] or its members" (ECF 53-5, Kato Decl. ¶ 5), yet testified to the contrary. Kato Depo. 53:15-22 ("As a team leader, part of my expectation was to find and recruit and hire people, yes. I used my personal networks to find and hire two people.").

Plaintiff argues the "U.S. Sales Independent Distributor and Direct Territory Compliance Manual" is the "primary policy" that all sales representative must follow, but he provides no evidence showing that this Manual controlled sales representatives in their day-to-day primary duty of selling to surgeons.  Rather, the evidence shows that sales representatives, *including Plaintiff's own declarants*, did not even see, let alone read, the Manual and conceded it had no impact on their daily selling activities.

> Q: As a sales representative for Zimmer Biomet, did you ever receive a U.S. sales independent distributor and direct territory compliance manual?
> A: No.
> Q: As a sales representative for Zimmer Biomet, did you ever receive a code of business conduct and ethics fraud and abuse policy?
> A: No.
> Q: Do you remember any of these policies that I just listed applying to your day-to-day activities?
> A: No.

Senne Depo. 42:21-43:6

> Q:  In your experience, are there any provisions of the compliance manual that you believe impact or control how you do your work on a day-to-day basis?
> A: I can't say.  I don't know.
> Q: In your experience, are there any provisions in the code of business conduct and ethics that impact or control how you do your work on a day-to-day basis?
> A: I don't know.

---

[24] Andrews Depo. 68:6-9 ("Does [the Zimmer Biomet managers] require you to keep a sales call log or something like I just described?  A: No."); Neill Decl. ¶ 11; Guin Decl. ¶ 7; McMahon Decl. ¶ 6; Baker Decl. ¶ 9; Quigley ¶ 38; Kato Depo. 67:16-21; Siqueiros Decl. ¶ 4.

[25] Senne Depo. 85:20-86:1 ("John Norsigian left the hospital around noon every day to be home to pick his daughter up from school, and I would cover cases until 7 or 8:00 o'clock at night[.]"); Ewing Decl. ¶ 11; Neill Decl. ¶¶ 15, 17; Guin Decl. ¶ 13; McMahon Decl. ¶ 8; Baker Decl. ¶ 9; Siqueiros ¶ 17; Quigley ¶ 38.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 38870649.9

14

MPAS ISO DEFS.' OPP'N TO CLASS CERT.
Case No. 3:18-cv-04176-WHA

Q: Do you recall speaking with any person from Zimmer Biomet about anything in the compliance manual?

A:  No.

Q: And do you recall speaking with anyone from Zimmer Biomet about anything in the code of business conduct and ethics?

A: No.

Andrews Depo. 46:13-48:17. *See also* virtually identical testimony from Kato Depo. 39:25-40:10; Baker Depo. 161:17-164:19; Stottle Depo. 87:24-88:12; and representations from Sabourin Decl. ¶ 9; Kowalski Decl. ¶ 13; Siqueiros Decl. ¶ 24.

While Zimmer Biomet's policies require lawful conduct and compliance with applicable governmental regulations, Plaintiff improperly conflates such provisions as evidence of control over sales representatives' sales duties.[26] However, requiring sales representatives to follow applicable law and complete compliance training does not evidence a right to control. *See Hennighan v. Insphere Ins. Sols. Inc.*, 38 F. Supp. 3d 1083, 1100 (N.D. Cal. 2014) aff'd 650 Fed. Appx. 500 (9th Cir. 2016) ("Required meetings and training related to legal compliance do not necessarily indicate an employment relationship"); *Desimone v. Allstate Ins. Co.*, No. 96-3606, 2000 WL 1811385, at *13 (N.D.Cal. Nov. 7, 2000) (mandatory training to ensure compliance with State and federal law is not evidence of employment); *Taylor v. Waddell & Reed Inc*., No. 09-02909, 2013 WL 435907, at *6 (S.D. Cal. Feb. 1, 2013) ("allegations of 'control' pursuant to legal requirements are not employment indicia"); *Arnold v. Mut. Of Omaha Ins. Co*., 135 Cal. Rptr. 3d 213, 220 (Cal. Ct. App. 2011) (no significant right to control where agents were required to attend trainings offered for compliance with state law); *Missions Ins. Co. v. Workers' Comp. Appeals Bd*., 176 Cal. Rptr. 439 (Cal. Ct. App. 1981) (standards of performance and occasional classes concerning proper methods was not evidence of control over the manner of work).

Unlike compliance-related training, sales reps did not need to attend general product sales training.[27]  In addition, Plaintiff's argument is further contradicted by evidence that sales

---

[26] For example, the contractor agreements provide that "Representative shall not engage in any fraudulent conduct" SAA ¶ 6(b); "Representative shall not engage in unethical or illegal business practices" SAA ¶ 6(c); "Representative shall not  knowingly sell Products . . . outside the United States" SAA ¶ 6(d); "Representative agrees to attend and participate in . . . compliance, regulatory, and Product training" SAA ¶ 6(e); "Representative shall operate in accordance with the compliance and sales policies and procedure(s)" SAA ¶ 6(f); and "Representative's and its own representative's communications and representations to Company customers shall be true, accurate, complete and consistent with the labeling of products" SAA ¶ 6(i).

[27] *See e.g.*, Guin Decl. ¶ 14; Ceccarelli Decl. ¶ 7; Totemeier Decl. ¶ 9; Neill Decl. ¶ 5; Guin Decl. ¶ 14; McMahon Decl. ¶ 10; Neill Decl. ¶ 5; Siqueiros Decl. ¶ 19; Baker Decl. ¶ 12 ("Zimmer

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 38870649.9

15

MPAS ISO DEFS.' OPP'N TO CLASS CERT.
Case No. 3:18-cv-04176-WHA

1   representatives did not uniformly follow the contract policies. Notably, Karl himself chose not to

2   comply with the provision barring him from selling competitive products, admitting that he sold

3   competing products for other companies.  Karl Depo. 263:11-280:16; Exs. 1022-1032.

4        The class certification decisions cited in Plaintiff's Motion at pp. 19 and 20 are

5   distinguishable from the present case, because those cases involved evidence of either

6   greater/more specific levels of control or class members' being subject to such control on a

7   practical level in the performance of their duties, unlike the evidence in the present case that

8   demonstrates materially different experiences among sales representatives relating to Zimmer

9   Biomet's right to, and exercise of, any control. For example, in *Norris-Wilson v. Delta-T Grp.,*

10  *Inc.,* 270 F.R.D. 596, 608 (S.D. Cal. 2010), the court observed that it would "see the difficulty in

11  trying to adjudicate the workers' proper classification with respect to the putative class as a

12  whole" if the defendant either "actually supervised some workers and not others, or supervised

13  them all but in vary degrees" or "evaluated some workers and not others, or evaluated them all

14  but in different ways."[28]

15       "[T]he existence of some uniform control [] does not automatically signify that common

16  issues predominate." *Martinez,* 2016 WL 10746664, at *fn 2; *see also Rowe v. Ulta Salon,*

17  *Cosmetics & Fragrance, Inc.*, No. SACV191074PAJCX, 2019 WL 6998780, at *6 (C.D. Cal.

18  Aug. 30, 2019) (holding common issues did not predominate because "[d]efendant present[ed]

19  compelling evidence that [company protocols] 'are not strictly or uniformly enforced' and some

20  guidelines are 'seldom observed.'").  Here, control cannot be proven with common evidence.

21       **a.   Significant Differences Exist As to *Borello's* Secondary Factors.**

22       In addition to evaluating a defendant's right to control work details, the fact-finder must

23  _____

24  Biomet does not require that I attend trainings, but I do attend from time to time because it is
    helpful to keep my product and industry knowledge up to date.")

25  [28] Similarly, in *Dalton v. Lee Publications, Inc.,* 270 F.R.D. 555, 563 (S.D. Cal. 2010) the court
    noted that "[t]here is no evidence before the Court that the parties' rights and obligations were

26  substantially different from those set forth in the contracts."  As another example, the defendant
    in *Villalpando v. Exel Direct, Inc.* 303 F.R.D. 588, 604 (N.D. Cal. 2014) required drivers wear

27  uniforms, have corporate logos on their truck, drive the exact route they were assigned each day,
    obtain permission before using a helper, and various other facts. The court in *Guifu Li v. A*

28  *Perfect Franchise, Inc.,* No. 5:10-CV-01189-LHK, 2011 WL 4635198, at *5 (N.D. Cal. Oct. 5,
    2011) found relevant that all putative class members were supervised by the same person the
    entire class period.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 38870649.9          16          MPAS ISO DEFS.' OPP'N TO CLASS CERT.
                                      Case No. 3:18-cv-04176-WHA

also consider various "secondary indicia" enumerated by *Borello* 48 Cal. 3d at 351 including:

> "(a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee."

*Borello* also "approvingly cited" other factors, including: (i) the alleged employee's opportunity for profit and loss depending on his managerial skill; (j) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; and (k) whether the service rendered requires a special skill. *Id.* at 407.

Because the *Borello* secondary factors cannot be resolved by common evidence in the present case, the Court should deny class certification. *See, e.g.*, *Narayan*, 285 F.R.D. at 480 (denying certification of class of delivery drivers because secondary factors interfered with a showing of predominance). *First,* whether each representative is "engaged in a distinct occupation or business" cannot be determined without individual inquiries. "[T]he predominance analysis for this factor turns on whether [putative class members] are engaged in different work from each other." *Soares v. Flowers Foods, Inc.*, No. 15-cv-04918, 320 F.R.D. 464 (N.D. Cal. 2017) (denying certification where, although defendant maintained the right to control certain aspects of performance common to all class members, the distinct occupation or business issue "is riddled with individualized inquiries" because distributors can hire helpers); *Spencer v. Beavex, Inc.*, No. 05-CV-1501 WQH (WMC), 2006 WL 6500597, at *16 (S.D. Cal. Dec. 15, 2006) (denying class certification due to distinct business factor, "[t]he issue of what use different drivers make of the option to use backups and subs is a highly individualized question of fact[.]") *Narayan*, 285 F.R.D. at 478 (denying class certification on the distinct occupation or business factor because "the differences in the class members' operations, such as whether they hired sub-drivers and whether they contracted with other companies.") Here, some sales representatives

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 38870649.9

17

MPAS ISO DEFS.' OPP'N TO CLASS CERT.
Case No. 3:18-cv-04176-WHA

hire helpers for administrative and client-facing tasks.[29]  No common evidence of this factor

exists because Zimmer Biomet does not track whether contractors hire helpers.

*Second,* Zimmer Biomet's supervision of representatives cannot be determined using

common evidence. *See,* in addition to Defendants' declarants; Kato Depo. 75:21-25 ("Q: So is it

fair to say that 99 percent of the surgeries that you covered [Zimmer Biomet manager] Don

Quigley was not physically there? A: Yes. And when he was there, he was not – we were running

the show."). *Martinez,* at *5 (denying certification where "the Branch Sales Managers actually

exercised varying degrees of supervision over class members" with some having frequent contact

with and close monitoring by managers, while rarely interacting managers.)

*Third,* the "level of skill" inquiry cannot be resolved commonly.  For example, Karl

testified that junior representatives lacked the skill necessary perform his duties.  Karl Depo.

227:15-20 ("[A] lot of those times are cases that other people on my team, maybe junior reps, that

they're not qualified to cover yet."). Some representatives, like Karl, have decades of experience

and skills and/or relevant education, while others are new to medical device sales.

*Fourth,* while skill level varies, medical device sales requires specialized skills.

*Hennighan,* 38 F. Supp. 3d at 1103 (plaintiff was contractor under *Borello* in part due to skills

needed).  Kato Depo. 43:5-16 ("Q: Why do you think that being a medical device sales

representative requires specialized skills?  A: Because you don't work at the hospital, and you

have to have people at the hospital want you to come be there with you to a surgery in order to

have value for both their lives and the lives of their patients. I don't think that a lot of people

would get the invite to come in and do that had they not had a specialized skill set in order to add

value to the situation, without being an examination risk of the patient in the hospital.") Andrews

Depo 57:12-21 ("Q: And in what respect do you think that your work requires special skills? A: I

believe that you couldn't just pick up anyone off the street to be able to be a sales rep in the

medical device field.  Not only dealing with hospitals, doctors, nurses, PAs, we have to know

medical terminology, anatomy, have to have product knowledge, and need to be able to service

---

[29] Baker Decl. ¶ 4 ("I occasionally hire someone as a 1099 to help me run my corporation. I pay
these individuals to perform a variety of administrative tasks, such as bookkeeping and file
management."); Kato Depo. 72:4-18; Andrews Depo. 71:10-72:11.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 38870649.9

18

MPAS ISO DEFS.' OPP'N TO CLASS CERT.
Case No. 3:18-cv-04176-WHA

1    cases and know how to use a product effectively and efficiently.  So I don't believe that anyone

2    could just do this.").

3        *Fifth,* whether Zimmer Biomet or the representative supplies "instrumentalities, tools, and

4    place of work" presents individualized inquiries.  Karl Depo. 234:2-7 ("Q: Zimmer doesn't

5    provide you with an iPad or tablet. True? A: Not me, but other sales reps, yes."); Andrews Depo.

6    56:1-6 ("Q: And did Zimmer Biomet give you any of the equipment for your home office? A:

7    When I was hired I received an iPad.").[30]

8        *Sixth,* the "opportunity for profit or loss" factor is highly individualized.  *See Sotelo v.*

9    *MediaNews Grp., Inc.*, 207 Cal. App. 4th 639, 658-59 (2012) ("opportunity for profit" requires

10    individualized inquiries).  Commission-based representatives have a higher opportunity for profit

11    than flat-rate representatives do.[31]  Sales agreements do not provide common evidence as they are

12    not always true.  Senne Depo. 64:15-19 ("Q: So what you're saying is, despite what your Sales

13    Associate Agreement says in terms of commission percentages, you were only paid a flat $45,000

14    fee plus an additional $5,000? A: Yes.") Opportunities for loss vary significantly as reflected in

15    Plaintiff's declarants' annual expenses (rounded to the nearest thousand), *compare* William

16    Anderson's $36,000 *with* Lucas Scalzo, $20,000. There is no common evidence for this factor.

17        *Finally,* many sales representatives simply *want* to remain independent contractors.[32]

18    **C.    The Court Should Not Certify a Post-January 1, 2020 "Misclassification Class" under the "ABC Test".**

19
20        Effective January 1, 2020, Labor Code section 2750.3 ("AB 5") codified the "ABC test"

21    and expanded its coverage to Labor Code claims.  Under the ABC Test, a worker is presumed to

22    be an employee, unless the defendant establishes that the worker (A) is free from the control and

23    direction of the hiring entity in connection with the performance of the work, both under the

24    contract for the performance of the work and in fact; (B) performs work that is outside the usual

25    course of the hiring entity's business; and (C) is customarily engaged in an independently

26    established trade, occupation, or business of the same nature as the work performed. Section

27    ─────────────────────────
[30] Totemeier Decl. ¶ 15; Sabourin Decl. ¶ 26; McMahon Decl. ¶ 11; Neill Decl. ¶ 13.
[31] *Contrast* Andrews Depo. 137:6-22; Ceccarelli Decl. ¶ 4; *with* Baker Decl. ¶ 4; Kowalski Decl.

28    ¶ 3; McMahon Decl. ¶ 6; Neill Decl. ¶ 12; Nielsen Decl. ¶ 8; Totemeier Decl. ¶ 12.
[32] *See* Nielsen Decl. ¶ 17; Totemeier Decl. ¶ 13; Sabourin Decl. ¶ 21; Ceccarelli Decl. ¶ 15;
Kowalski Decl. ¶ 6; Siqueiros Decl. ¶ 13.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 38870649.9                                    19                    MPAS ISO DEFS.' OPP'N TO CLASS CERT.
                                                                        Case No. 3:18-cv-04176-WHA

2750.3(e), however, provides an exemption from the ABC Test for a "bona fide business-to-business contracting relationship," and provides that the *Borello* test will apply:

> (1) If a business entity formed as a sole proprietorship, partnership, limited liability company, limited liability partnership, or corporation ("business service provider") contracts to provide services to another such business ("contracting business"), the determination of employee or independent contractor status of the business services provider shall be governed by *Borello*, if the contracting business demonstrates that all of the following criteria are satisfied:

The various criteria are identified in sub-sections (A) through (L).  Determining whether each of these criteria are met (many of which mirror the *Borello* factors described *supra*) will require individualized inquiries with respect to each sales representative.  Even determining the initial matter of whether a putative class member has created and operated as a business entity (such as the S-Corporations and LLCs that employed and paid Karl, Stottle, Andrews, etc.) cannot be determined using common evidence.  Some sales representatives choose to operate their business as a corporation, whereas others decided against it. *Contrast* Karl Depo. 246:2-8 ("Q: And why did you set up Edge Medical Group and/or JWK Management, Inc.? A: As an independent contractor, I was told it's better as far as for being an independent contractor to set and manage it, keep your -- in the separate entities to protect you, you know, your personal finances.") *with* Kato Depo. 23:21-23 ("I also contacted my accountant Jim Milner who thought it was not a good idea because he thought it would not -- it would cost me more money.").[33]

While all putative class members meet criteria (B) (contract with and provide services directly to Zimmer Biomet), (C) (have contracts in writing), and (E) (have a separate work location from the company), there is no common evidence that will generate a single answer as to the other criteria listed Section 2750.3(e)(1) are met, including, for example, whether a particular sales representative: (A) is free from the control and direction "both under the contract for the performance of the work and in fact;" (G) actually contracts with other businesses; (H) advertises to the public for the same or similar services; (I) provides his own tools, vehicles, and equipment; (J) can negotiate his own rates; (K) sets his own hours/location of work; and (F) is customarily

---

[33] *See also* Baker Decl. ¶ 4; Sabourin Decl. ¶ 20; Neill Decl. ¶ 4; Ewing Decl. ¶ 4; Marshall Decl. ¶ 4; Kowalski Decl. ¶ 7 (all chose to create and operate as business entities) and Nielsen Decl. ¶ 16; Guin Decl. ¶ 9; Siqueiros Decl. ¶ 7 (chose not to create business entities).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 38870649.9

20

MPAS ISO DEFS.' OPP'N TO CLASS CERT.
Case No. 3:18-cv-04176-WHA

1   engaged in the same nature of business performed.  Predominance does not exist post-1/1/2020.

2        **D.**    **The Court Should Not Certify An Expense Reimbursement Class.**

3        Even if Plaintiff could prove the threshold misclassification question could be resolved on

4   a class-wide basis, his failure to show that the expense reimbursement claim can be resolved with

5   common proof serves as a separate, independent basis to deny his Motion.  *See Ruiz v. Affinity*

6   *Logistics Corp.*, No. 05CV2125JLS (CAB), 2009 WL 648973, at *7-8 (S.D. Cal. Jan. 29, 2009)

7   (common proof of misclassification insufficient to certify Labor Code claims); *Bertulli v. Indep.*

8   *Ass'n of Cont'l Pilots*, 242 F.3d 290, 296 (5th Cir. 2001) ("[a] class should be certified on a

9   claim-by-claim basis").  Labor Code section 2802 obligates an employer to indemnify employees

10  for *reasonable and necessary* work-related expenses. The employer also "must either know or

11  have reason to know that the employee has incurred [the] expense." *Marr v. Bank of Am.*, No. 09-

12  cv-05978, 2011 WL 845914, at *1 (N.D. Cal. Mar. 8, 2011) (Alsup, J.); *see also Stuart v.*

13  *RadioShack Corp.*, 641 F. Supp. 2d 901, 903 (N.D. Cal. 2009).  Whether an expense is

14  "reasonable" and "necessary" clearly depends on the circumstances. *Gattuso v. Harte-Hanks*

15  *Shoppers, Inc.*, 42 Cal.4th 554, 568 (2007).  As a result, Section 2802 claims are "problematic" to

16  certify because "there may be substantial variance as to what kind of expenses were even incurred

17  by [the putative class] in the first place." *O'Connor v. Uber Tech.*, No. 13-3826 EMC, 2015 WL

18  5138097, at *14 (N.D. Cal. Sept. 1, 2015); *Ruiz*, 2009 WL 648973, at *6 (denying certification

19  because of differences in reasonability of expenses); *see also Guifu Li,* 2011 WL 4635198, at *14

20  (denying certification of section 2802 claim where plaintiffs did not narrow their "claim to any

21  specific expenses or category of expenses, and as a result, Plaintiffs claim reimbursement over a

22  wide and divergent range of items").  Certification of such claims requires a plaintiff to identify

23  "specific expenses or categor[ies] of expenses" incurred uniformly on a class-wide basis (or

24  calculable based on a common formula), and that the answers as to whether an expense was

25  reasonable and necessary are subject to common class-wide proof. *Id*.

26       Plaintiff argues that the Payroll Deduction Guidelines are "a predetermined roadmap as to

27  what expenses sales representatives incur without reimbursement."  However, Karl does not limit

28  his claim to the expenses on the Guidelines, but seeks reimbursement for "gas, car maintenance,

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 38870649.9

21

MPAS ISO DEFS.' OPP'N TO CLASS CERT.
Case No. 3:18-cv-04176-WHA

car wear and tear, parking, insurance, phone data charges, and marketing expenses." And, the expense categories and percentages differ between the Agreements. *See supra*. Also, some sales representatives "don't recall" being reimbursed for expenses according to these Guidelines (Kato Depo. 85:18-25) while others deny any impact of the Guidelines (Senne Depo. 50:24-51:2). Some sales representatives negotiated reimbursement of certain expenses with their TGM.  Kato Depo. 86:22-87:5. One of Plaintiff's San Francisco-based declarants, Mr. Kato, admitted sometimes walking to UCSF where he covered "most cases," and thus would not incur any mileage expense. Kato Depo. 51:7-11; 53:10-12.  For sales representatives who sold products for other companies, trying to separate what cell phone or office expenses, for example, were attributable to Zimmer Biomet sales versus other company sales would require a complicated and individual review of their records and sales histories.[34] Determining whether any particular sales representative's expenses were "reasonable" and "necessary" requires an individualized inquiry.

In *Norris-Wilson v. Delta-T Grp., Inc.* 270 F.R.D. 596, 610, (S.D. Cal. 2010) the defendant predetermined certain deductions, but the plaintiff more broadly sought non-predetermined expenditures incurred in traveling between client-sites, running errands for clients, transporting patients, and other costs. The court found common questions did not predominate:

> "the putative class here includes a range of behavioral healthcare professionals who worked at a range of client sites performing a wide range of services. It is hard to see how the expenses they incurred in the process could be ascertained in one fell swoop, or even several fell swoops. The question necessarily requires a worker-by-worker, highly individual analysis. It isn't even clear that expenses "were in the same ballpark across the class . . . such an expansive and varied list of expenditures for which Plaintiffs seek reimbursement is not suitable for class treatment." *Id.*

**E.      Conflicts of Interest Exist Between The Putative Class Members.**

In reviewing adequacy under Rule 23(a)(4), the Court must examine whether Plaintiff has conflicts of interest with other class members. *Staton v. Boeing, Co.*, 327 F.3d 938, 957 (9th Cir. 2003). Conflicts will defeat a plaintiff's representative status. *Global Minerals & Metals Corp. v.*

---

[34] Stottle Depo. 82:14-17 ("Q: Isn't it true that you used the same cellphone to communicate with your Zimmer Biomet accounts and your Breg accounts? A: Yeah, that, and my e-mail."); Karl Depo. at 260:20-261:4 ("Q: Are you able to tell what amount of these expenses was incurred performing service on behalf of Zimmer Biomet versus what amount was incurred performing services on behalf of any other entity for which you sold medical products or devices?  A: I don't know if I could sit down and – if I went through my books, I could probably tell you exactly.  But from looking at this, I cannot.")

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 38870649.9

22

MPAS ISO DEFS.' OPP'N TO CLASS CERT.
Case No. 3:18-cv-04176-WHA

*Super. Ct.*, 113 Cal. App. 4th 836, 851 (2003).  Here, conflict exists between class members who were Team Leaders and those who were not.  Several declarants testified that some references in their declarations to "Zimmer Biomet" actually meant "Team Leaders", who were, like themselves, independent contractors and putative class members, and that Team Leaders controlled their activities, implemented on-call schedules, and required communications.  Kato Depo. 62:25-63:5, 65:7-17; Andrews Depo. 30:3-13, 68:10-70:11; Senne Depo. 39:19-40:13, 56:18-20, 85:10-17; Baker Depo. 79:24-81:10, 85:12-86:3, 193:17-194:6, 209:23-210:11, 266:10-17, 269:24-270:15.  Some admitted conflicts with Team Leaders. Baker Depo. 137:25-138:13, 197:13-198:11, 274:1-275:3 ("Q: Why were you fearful? A: Because I thought it would affect my worklife negatively. Q: *Because he was the team leader*? A: Yeah. He does the schedule and tells us when to start and stop the day. What kind of assignments you get. You know, there's ways of knowing that you're in the dog house.") ("Q: Were you ever reprimanded? A: Yes. Q: By Sean Ewing and Robert Perrett?  A: Yes.  Q: And they were other contractor sales representatives, correct? A: Yes.")  Certification should be denied where persons who allegedly engaged in unlawful practices are in the same putative class as "subordinates."  *Harrison v. Wal-Mart Stores, Inc.*, 613 S.E.2d 322, 329-30 (N.C. Ct. App. 2005) (class including manager not certified where "some putative class members assert that other putative class members caused or contributed to the wrongs asserted and the latter deny the assertion.  This puts class members who acted as supervisors in direct conflict with the class members they supervise."); *White v. Osmose, Inc.*, 204 F. Supp. 2d 1309, 1314-15 (M.D. Ala. 2002) (persons "potentially complicit in the allegedly unlawful practice" weren't "similarly situated" due to "conflict of interest.").

### F.    The Court Should Not Certify A UCL Class Claim

This Court found the UCL claim is viable only to the extent it derives from Karl's expense reimbursement claim. Order re: Summary Judgment, Dkt. 118 at 12 ("Because Karl's sixth claim for expense reimbursement is still live, his Section 17200 claim is still viable at least to that extent."). However, Karl seeks to certify a UCL class (a) to recover employment-related benefits, and (b) based on alleged violation of the Medicare Anti-Kickback law. Neither claim has merit.

First, UCL remedies are "generally limited to injunctive relief and restitution." *Ferrington*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 38870649.9

23

MPAS ISO DEFS.' OPP'N TO CLASS CERT.
Case No. 3:18-cv-04176-WHA

1    *v. McAfee, Inc.*, 10-cv-01455, 2010 WL 3910169, *7 (N.D. Cal. Oct. 5, 2010), *citing Korea*

2    *Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144 (2003). "Damages and non-

3    restitutionary disgorgement are not available."  *Id*.  The measure of restitution is "profits unfairly

4    obtained to the extent that these profits represent . . . benefits in which the plaintiff has an

5    ownership interest." *Id*. at 1148.  The "notion of restoring something to a victim of unfair

6    competition includes two separate components. The offending party must have obtained

7    something to which it was not entitled *and* the victim must have given up something which he or

8    she was entitled to keep." *Day v. AT & T Corp.* 63 Cal. App. 4th 325, 340 (1998); *see also In re*

9    *First All. Mortg. Co.*, 471 F.3d 977, 997 (9th Cir. 2006) ("[R]estitution means the return of

10   money to those persons from whom it was taken or who had an ownership interest in it.").

11          To determine a putative class member's eligibility for a particular employment benefit, the

12   Court would need to individually analyze each benefit plan.  *Aguilar v. CTB McGraw-Hill, LLC,*

13   No. C 06-02160 JW, 2006 WL 8446861, at *1 (N.D. Cal. Dec. 5, 2006) (finding "even if Plaintiff

14   were a common law employee, CTB's ERISA plans do not make all "common law employees"

15   eligible for benefits."); *Curry v. CTB McGraw-Hill, LLC*, 296 F. App'x 563, 564–65 (9th Cir.

16   2008) (finding plaintiffs were not eligible for retirement, health, welfare, and cafeteria plan

17   benefits based on plans' terms and eligibility requirements).  Here, Zimmer's employment benefit

18   plans do not allow re-classified, common law employees to be eligible for benefits. Monroe Decl.

19   ¶¶4-13, Exs. A-H.  Each Summary Plan Description expressly states: "You are not eligible to

20   participate if you are . . . 'reclassified as a common law employee by any court, government

21   agency or similar authority.'" *Id*.  As a result, even if Plaintiff could prove he was misclassified,

22   he would not be eligible under any plan and had no "ownership interest" in plan benefits.[35]  With

23   respect to sick leave, workers' compensation, disability insurance, and/or unemployment

24   insurance, Karl lacks "standing" because the UCL "limits standing to plaintiffs who have

25   'suffered injury in fact and [have] lost money or property as a result of the unfair competition.'"

26   *Murphy v. Best Buy Stores, L.P.*, 690 F. App'x 553, 554 (9th Cir. 2017) (quoting § 17204).

27
28

---

[35] Individualized issues exist because some sales representatives benefitted financially by
deducting the cost of health insurance from their taxable income. Marshall Decl. ¶ 21, Siqueiros
Decl. ¶ 9; Senne Depo. 92:4-13; Meckley Decl. ¶ 5, Ex. D (RFA Nos. 5 and 11). Others insured
through their spouse's employers at no cost. Ceccarelli Decl. ¶ 13, Nielsen Decl. ¶¶ 14-15.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 38870649.9

24

MPAS ISO DEFS.' OPP'N TO CLASS CERT.
Case No. 3:18-cv-04176-WHA

"Standing under the UCL is narrower than standing under article III … ," as the UCL requires a showing of "economic injury." *Wright v. Gen. Motors Acceptance Corp.*, 2012 WL 253157, at *3 (S.D. Cal. Jan. 25, 2012), *aff'd*, 545 F. App'x 686 (9th Cir. 2013).  Here, Karl has not shown economic injury or that he had any condition necessitating use of CA-law sick leave, workers' compensation, etc.  Meckley Decl. ¶ 5, Ex. D (RFA Nos. 3, 7, 8, 9, 10).  Thus, he cannot pursue a UCL class claim for such benefits. *Birdsong v. Apple, Inc.*, 590 F.3d 955, 961 (9th Cir. 2009); *Mkt. Trading, Inc. v. AT&T Mobility, LLC*, 388 F. App'x 707, 709 (9th Cir. 2010).

Second, the Anti-Kickback statue ("AKS"), 42 U.S.C. § 1320a-7b(b), *et seq*., cannot support a UCL class claim. First, he never mentioned the AKS in his complaint or in discovery. *In re Barker*, 839 F3d 1189, 1195 (9th Cir. 2016) (party conclusively bound by factual allegations in his pleadings in current litigation).  Second, the AKS is immaterial to misclassification claims under the Labor Code, *e.g*., whether the government could prove a criminal violation of the AKS has no bearing on the *Borello* factors under CA law.  Third, Karl has not shown how he could recover UCL restitution for supposed violation of a criminal statute.  Fourth, retaining him as an independent contractor is not *per se* illegal under the AKS, because proving violation of its prohibitions on "arranging for or recommending" the purchase of covered items requires an multi-factor review and evidence of actual "bad intent" to exert improper influence. *See* U.S. Department of Health and Human Services Office of Inspector General ("OIG") Advisory Opinions 98-10 (August 31, 1998) (no sanctions imposed where commissions paid to independent sales agent) and 99-3 at 5.1 (March 16, 1999); *Hanslester Network v. Shalala*, 51 F.3d 1390, 1401 (9th Cir. 1995).[36]  Fifth, *Zimmer, Inc. v. Nu Tech Medical, Inc.* is inapposite because it involved a distributor contract that was different than the direct contractor agreements here (notably, the section prohibiting Karl from making payments to doctors to induce them to order ZB products (SAA ¶¶ 5(b)(i), 6(c), 13(a)), and *Nu Tech* did not address misclassification.

In conclusion, class certification should be denied as to all of Plaintiff's claims.

Dated: June 11, 2020                       Morgan, Lewis & Bockius LLP

                                                       */s/ Eric Meckley*

---

[36] The OIG Advisory Opinions cited herein are attached to Defendants' Request for Judicial Notice, previously submitted to the Court at Dkt 101. Defendants incorporate that Request here.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 38870649.9                                          25                    MPAS ISO DEFS.' OPP'N TO CLASS CERT.
Case No. 3:18-cv-04176-WHA