1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JAMES KARL, on behalf of himself, and on
behalf of a class of those similarly situated,

        Plaintiffs,

    v.

ZIMMER BIOMET HOLDINGS, INC, a
Delaware corporation, ZIMMER US, INC.,
a Delaware corporation, BIOMET U.S.
RECONSTRUCTION, LLC, an Indiana
limited liability company, BIOMET
BIOLOGICS, LLC, an Indiana limited
liability company, and BIOMET, INC., an
Indiana corporation,

        Defendants.

No.  C 18-04176 WHA

**ORDER CERTIFYING CLASS
AND APPOINTING CLASS
COUNSEL**

**INTRODUCTION**

    In this employment classification action, plaintiff sales associates seek class certification.

Because defendants' right (or not) of control can be proven by common policy — regardless

of whether defendants actually possess or exercise that right — a class is **CERTIFIED**.

**STATEMENT**

    Prior orders detail the essence of this case (Dkt. No. 127).  In brief, defendant (and parent

corporation) Zimmer Biomet Holdings, Inc. and its subsidiaries design, manufacture, and

market biopharmaceutical and medical products.  Relevant here, subsidiaries Zimmer US, Inc.,

Biomet U.S. Reconstruction, LLC, and Biomet Biologics ("Zimmer") sell knee, hip, sports medicine, foot and ankle, extremity, and trauma products to physicians and hospitals.

In August 2015, plaintiff James Karl signed a sales associate agreement classifying him as an independent contractor (and *not* an employee) with Zimmer and began selling orthopedic devices as a member of "Team Golden Gate" in the San Francisco Bay Area. Zimmer paid the team on a commission-only "pooled" arrangement. That is, defendants (1) set a "base rate" commission percentage for each product type sold, (2) pooled each team member's base rate commissions, and (3) paid each member a predetermined percentage of the pooled commissions, regardless of the amount of commissions that member personally generated. Karl himself was paid through Edge Medical, LLC, an entity he established for tax purposes.

On the job, Karl typically spent 60 to 70 percent of his time on "case coverage," assisting surgeons in the operating room — including setting up Zimmer's products, informing a surgeon of a product's safety and efficacy, and fielding questions — and planning for procedures, such as designing modifications for implants. He averaged between ten to twelve hours each workday.

In July 2018, Karl filed the instant putative class action alleging primarily his misclassification as an independent contractor instead of an employee of Zimmer. Initially successful in certifying an FLSA collective (Dkt. No. 70), Zimmer's motion for summary judgment cut down several of Karl's claims (including those for overtime wages and failure to provide meal and rest periods), an October 31, 2019 order finding him an exempt "outside salesperson" (Dkt. No. 127). Though the Court certified the summary judgment order for interlocutory appeal, our court of appeals declined to intervene (Dkt. No. 131).

The case having resumed, Karl seeks, for himself and the putative class, reclassification as employees of Zimmer, itemized wage statements, reimbursement of business expenses, restitution for unpaid wages and benefits, and a finding that their classification as independent contractors was unlawful. Plaintiffs now move for class certification under Federal Rule of Civil Procedure 23. Following an initial proposed class definition reaching to nearly a year

United States District Court
Northern District of California

before the merger that created the current Zimmer Biomet Holdings and the relevant

subsidiaries, Karl has revised his class definition to:

> Any person who, during the period commencing June 24, 2015 to
> the present, was hired or otherwise engaged as an independent
> contractor for the purposes of solicitation or sales of Zimmer
> Biomet products and/or services in California by Zimmer US, Inc.,
> Biomet U.S. Reconstruction, LLC, and Biomet Biologics, LLC, or
> any one of them.

(Dkt. No. 164).   Zimmer naturally opposes certification.   This order follows full briefing and a

hearing (held telephonically due to COVID-19).

## ANALYSIS

Numerosity of members, commonality of issues, typicality and adequacy of

representatives, and one requirement from Rule 23(b) guard the door to class certification.

*Abdulla v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 956–57 (9th Cir. 2013).  Our plaintiffs seek a

Rule 23(b)(3) class, so "questions of law or fact common to class members [must] predominate

over questions affecting only individual members," and a class must be the superior method

"for fairly and efficiently adjudicating the controversy."

### 1.   COMMONALITY AND PREDOMINANCE.

Commonality requires "questions of law or fact common to the class."  Rule 23(a)(2).  "A

common contention need not be one that will be answered, on the merits, in favor of the class.

It only must be of such nature that it is capable of classwide resolution."  *Alcantar v. Hobart

Servs.*, 800 F.3d 1047, 1053 (9th Cir. 2015).  There need only be "a single significant question

of law or fact.  *Stockwell v. City & Cty. of San Francisco*, 749 F.3d 1107, 1111 (9th Cir. 2014).

Superseding commonality, predominance under Rule 23(b)(3) asks whether a putative

class is "sufficiently cohesive to warrant adjudication by representation."  Predominant

questions makeup "a significant aspect of the case" and clearly justify "handling the dispute on

a representative rather than on an individual basis."  "[E]ven if just one common question

predominates, the action may be considered proper under Rule 23(b)(3) even though other

important matters will have to be tried separately."  *In re Hyundai & Kia Fuel Econ. Litig.*, 926

F.3d 539, 557 (9th Cir. 2019) (quotations omitted).

United States District Court
Northern District of California

"Merits questions may be considered to the extent — but only to the extent — that they are relevant to determining whether" plaintiffs have satisfied the requirements for class certification. *Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*, 568 U.S. 455, 465–66 (2013). That being said, deciding whether plaintiffs' claims lend themselves to common proof asks what law governs. So our "assessment of predominance begins, of course, with the elements of the underlying cause of action." *Walker v. Life Ins. Co. of the Southwest*, 953 F.3d 624, 630 (9th Cir. 2020) (quotation omitted).

Two employment-classification standards apply here. Up to January 1, 2020, the common law governed as articulated by the California Supreme Court in *Borello & Sons v. Dep't of Indus. Rel.*, 48 Cal. 3d 341, 769 P.2d 399 (1989):

> Under the common law, the principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired. What matters is whether the hirer retains all *necessary* control over its operations. The fact that a certain amount of freedom of action is inherent in the nature of the work does not change the character of the employment where the employer has general supervision and control over it. *Perhaps the strongest evidence of the right to control is whether the hirer can discharge the worker without cause,* because the power of the principal to terminate the services of the agent gives him the means of controlling the agent's activities.

*Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522, 531, 327 P.3d 165, 171 (2014) (quotations and citations omitted) (emphasis added). Several "secondary indicia" also inform this analysis:

> Courts may consider (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.

4

*Id.* at 532 (quotation omitted).  *Borello* also favorably cited several other indicia, including "(1) the alleged employee's opportunity for profit or loss depending on his managerial skill; (2) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; [and] (3) whether the service rendered requires a special skill."  48 Cal. 3d at 354–55.

On January 1, 2020, the California Legislature displaced the common law, codifying the California Supreme Court's decision in *Dynamex Ops. West, Inc. v. Sup. Ct.*, 4 Cal. 5th 903, 416 P.3d 1 (Cal. 2018).  Now:

> [A] person providing labor or services for remuneration shall be considered an employee rather than an independent contractor *unless* the hiring entity demonstrates that *all of the following* conditions are satisfied:
>
> (A)   The person is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact;
>
> (B)   The person performs work that is outside the usual course of the hiring entity's business; [and]
>
> (C)   The person is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed.

Cal. Labor Code § 2750.3(a)(1) (emphasis added).  Zimmer contends an exemption reverts the analysis to the common law, though whether it applies asks a merits question properly left for a later date.  *See* § 2750.3(a)(3), (e).  For now, it suffices that these two frameworks comprise the relevant universe of governing law.

Despite this kernel of consensus, the parties disagree how the predominance analysis should proceed because, naturally, both continually venture into the merits.  Plaintiffs seek to show Zimmer's control; Zimmer, the lack of it.  Fortunately, the California Supreme Court gave a pertinent explanation in *Ayala* that helps at the class certification stage.  Yes — this order hastens to acknowledge — FEDERAL RULE OF CIVIL PROCEDURE 23 governs class certification here, not California's own procedural rules.  *See Hanna v. Plumer*, 380 U.S. 460, 465 (1965).  But, as above, Rule 23(b)(3) asks if common questions drive resolution of the case, a question

which necessarily turns to the substance and, thus, California's determination of what facts

matter, how they might be proven, and what conclusions follow.  *Hyundai*, 926 F.3d at 557.

In *Ayala*, the California Supreme Court explained that:

> [A]t the certification stage, the relevant inquiry is not what degree
> of control [Zimmer] retained over the manner and means of its
> [device sales].  It is, instead, a question one step further removed:
> Is [Zimmer's] right of control over its [sales associates], whether
> great or small, sufficiently uniform to permit classwide
> assessment?  That is, is there a common way to show [Zimmer]
> possessed essentially the same legal right of control with respect to
> each of its [salespeople]?  Alternatively, did its rights vary
> substantially, such that it might subject some [salespeople] to
> extensive control [of their conduct], subject to firing at will, while
> as to others it had few rights and could not have directed their
> [conduct] even had it wanted, with no common proof able to
> capture these differences?

59 Cal. 4th at 533–34.  *Ayala* then identified three pitfalls facing a trial court presented with a

class certification motion in the employer-classification context.

*First*, recalling that worker classification turns on the *right* to control and not the

employer's *exercise* of it, *Ayala* explained that the importance of an employer's policies lie not

in *what* they say, but whether (and the extent to which) the policies speak uniformly.  Plainly,

the inquiry begins with the written policies and written employment contracts.  And, while

*Ayala* acknowledged that other evidence could certainly contradict the contractual allocation of

rights, it cautioned that an employer's choice "not to wield power does not prove it lacks

power."  *Id.* at 534–36.

*Second*, *Ayala* reiterated that predominance turns on the susceptibility of the employer's

right of control to *common proof*, and not on whether the employer actually possesses sufficient

control.  *Id.* at 536–538.

*Third*, *Ayala* rejected the notion that variations in the secondary indicia necessarily defeat

predominance.   Instead it explained trial courts should evaluate the factors "with an eye to the

reality that the considerations in the multi-factor test are not of uniform significance."  Thus,

"[t]he proper course, if there are individual variations in parts of the common law test, is to

consider whether they are likely to prove material."  *Id.* at 538–40.

6

United States District Court
Northern District of California

1    Common questions predominate under either classification framework.  Despite Zimmer's

2    protest, plaintiffs' theory of liability turns on Zimmer's written policies, common to their

3    workforce.  And, regardless of the variation in observance or enforcement, during the class

4    period Zimmer's written policies have spoken uniformly to the factors driving both frameworks.

5         **A.    COMMON LAW BORELLO FRAMEWORK.**

6              **(i)    Right of Control.**

7    To start, the *Borello* analysis turns on Zimmer's control of sales associates.  Most

8    important under *Ayala*, Zimmer retained via common policies the power to terminate sales

9    associates, including the power to terminate them without cause.  *Id.* at 531.  The sales associate

10   agreements plainly stated:

11          5.  Termination of Agreement.

12          (a)  It is agreed and understood that at any time Company can
            terminate this Agreement, *with or without cause*, by giving
13          Representative ten (10) days' written notice of such termination.
            Further, it is agreed and understood that at any time Representative
14          can terminate this agreement, with or without cause, by giving
            Company sixty (60) days' written notice of such termination.
15
            (b)  Notwithstanding any other provision of this Agreement,
16          Company may immediately terminate this Agreement for any of
            the following reasons:
17
                   (i)  If Representative fails to operate in accordance with any
18                 and all compliance policies, including, but not limited to
                   those set forth in Company's then-current Code of Business
19                 Conduct and Ethics, Fraud and Abuse Policy;

20                 (ii)  If Representative . . . engages in unethical or illegal
                   business practices or activities . . .
21
                   (iii)  If Representative . . . violates any of the restrictive
22                 covenants in this Agreement . . . .

23   (Dkt. No. 53-1, Exs. 25–28 at ¶ 5) (emphasis added).

24   Zimmer's common policies addressed quite a bit more of its sales associates' professional

25   conduct.  As Zimmer's own witness testified at deposition, "When we enter into agreements for

26   sales associates to represent and sell our products, we use a standard agreement" which, among

27   many others, limited what products associates could sell, restricted sales practices, limited

28   customers and locations associates could target, and mandated certain training.  And, when

7

asked at deposition whether Zimmer believed its sales associates followed the "Duties and Obligations" dictated in the agreement, the representative testified, "Yes, I believe they do, and we expect them to."  Zimmer also published a "compliance manual for distributors and direct reports," the "U.S. Sales Independent Distributor and Direct Territory Compliance Manual." And, just as the employer in *Borello*, Zimmer retained control via common policy of the pricing of the medical devices its associates sold (Dkt. No. 53-1 at 61, 107–10, 125–28, Exs. 25–28 at ¶ 2, 6).  Whether this constituted "all necessary control" remains to be seen, but it suffices for class certification that plaintiffs' theory turns on such common proof.  *See Borello*, 48 Cal. 3d at 356–57; *Ayala*, 59 Cal. 4th at 533, 535–37.

In opposition, Zimmer rates the standards by which it governed — "to exercise best efforts to aggressively market and sell the Products in the Territory" — as too broad to sufficiently constrain its sales associates.  It says that:

> Sales representatives make their own decisions and use their own judgment about the most effective sales techniques and strategies on a day-by-day basis.
>
> . . .
>
> [T]he only marketing limitations came from governmental regulatory guidelines prohibiting off-label promotion of FDA-approved products.
>
> . . .
>
> Sales representatives . . . could use their own personal email addresses for Zimmer Biomet sales-related work [and are] not being required to have or use Zimmer Biomet business cards.
>
> . . .
>
> [Zimmer] does not track daily activities or sales meetings.
>
> . . .
>
> [S]ales representatives are not required to submit on-call schedules, meeting schedules, or sales call logs to Defendants. They also have control over their own schedules and decide, for example, whether to work weekends, when to take vacation and personal days, and whether they wanted another sales representative to cover a surgery for them.
>
> . . .

> [And,] sales reps did not need to attend general product sales training.

Zimmer also contends that team leads controlled their team composition and that government regulations controlled sales more than its own rules did (Dkt. No. 158 at 10–16).

As *Ayala* cautioned, though, these arguments go to the *degree* of control Zimmer possessed, *i.e.*, to the merits of whether the sales associates *were*, in fact, misclassified. These broad conclusions indicate that Zimmer *did* impose a standard, it just (under Zimmer's telling, at least) bestowed broad discretion on sales associates. Frankly, "[i]t's only possible to make statements like this if it's possible to generalize across members of the putative class, which is precisely the position that [Zimmer] should be *contesting* for the purposes of opposing class certification in this case." *Norris-Wilson v. Delta-T Grp., Inc.*, 270 F.R.D. 596, 607–08 (S.D. Cal. 2010) (Judge Larry Alan Burns). Recall that predominance does *not* tell us who will win this case — it only tells us whether we can fairly determine who will win in (more or less) one representative action. *See Alcantar*, 800 F.3d at 1053; *Hyundai*, 926 F.3d at 557. Indeed, as the United States Supreme Court recently explained, where "the concern about the proposed class is not that it exhibits some fatal dissimilarity but, rather, a fatal similarity — [an alleged] failure of proof as to an element of the plaintiffs' cause of action — courts should engage that question as a matter of summary judgment, not class certification." *Tyson Foods v. Bouaphakeo*, 577 U.S. ___, 136 S. Ct. 1036, 1047 (2016). So, the relevant point here remains simply that Zimmer imposed some uniform standard of conduct (however controlling) upon its associates.

Zimmer also highlights variations in sales associate conduct that it argues undermine commonality. For example, "[s]ome sales representatives chose to offer discounts to surgeons" even though Zimmer provided the "list of the market prices for the devices." It also says its "U.S. Sales Independent Distributor and Direct Territory Compliance Manual" didn't actually govern, because "the evidence shows that sales representatives, including Plaintiff's own declarants, did not even see, let alone read, the Manual and conceded it had no impact on their daily selling activities." Even further, Zimmer explains that "sales representatives did not uniformly follow the contract policies," citing, among others, named-plaintiff Karl's own admission that, despite Zimmer's prohibition, he sold products from competing companies

9

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

(Dkt. No. 158 at 11–16).  But recall from *Ayala*, these arguments go to the *exercise* of control, not to its existence.  "That a hirer chooses not to wield power does not prove it lacks power." *See* 59 Cal. 4th at 535.

Zimmer replies, citing several decisions, to the effect that "the control that is actually exercised may be informative of the control that may be exercised."  *Harris v. Vector Marketing Corp.*, 753 F. Supp. 2d 996, 1021 (N.D. Cal. 2010) (Judge Edward M. Chen); *see Martinez v. Flower Foods*, No. C 15-05112 RGK, 2016 WL 10746664 at *11 (C.D. Cal. Feb. 1, 2016) (Judge R. Gary Klausner) ("the variations among drivers manifest a difference in the actual scope of Defendants' *right* to control"); *see also Rowe v. Ulta Salon*, No. C 19-01074 PA, 2019 WL 6998780 at *5–6 (C.D. Cal. Aug. 30, 2019) (Judge Percy Anderson); *Narayan v. EGL, Inc.*, 285 F.R.D. 473, 479–80 (N.D. Cal. 2012) (Judge Ronald M. Whyte).  Though well-reasoned in their own rights, these decisions are easily distinguishable because the court either noted the employer could not fire the workers at all, *Rowe*, 2019 WL 6998780 at *1, could only fire *with* cause, *Harris*, 753 F.Supp.2d at 1020–21, n. 12, or did not mention the right at all, *Martinez*, 2016 WL 10746664 at *11, *Narayan*, 285 F.R.D. 479–80.  *Harris* admittedly discounted the weight that an employer's right to terminate workers played in the analysis, relying on *Borello*. 753 F. Supp. 2d at 1020.  But of course the employer's right to terminate played little role in *Borello* — there the workers could not "be terminated or discharged without cause during the term of the contract or even, according to the testimony, for inadequate performance."  48 Cal. 3d at 364, 368 (Kaufman, J., dissenting), 348–49, 350 (opinion) (noting employer's "lack of authority to discharge [workers] at will").

This is to say, the above characterization still tells only half the story.  Even if Zimmer's "best efforts" and other standards bestow broad discretion upon sales associates who each interpret the standards differently, *Ayala* reminds us that everything here occurs in the shadow of Zimmer's right to terminate plaintiffs *without* cause.  So at the end of the day, perhaps the most powerful common standard remains: *Zimmer's* satisfaction with a sales associate.  *See* 59 Cal. 4th at 533.

### (ii)    *Secondary Indicia.*

The secondary indicia also largely turn on common evidence, Zimmer's policies.  To start, though, the secondary indicia simply inform the control analysis, they're not a counting game. So even if evidence regarding one or two factors fails to predominate over individual questions, class certification remains appropriate if common questions predominate over more important factors.  *Id.* at 539; *see Alexander v. FedEx Grd. Package Sys., Inc.*, 765 F.3d 981, 988 (9th Cir. 2014).  Regardless, where one or more central issues predominate, Rule 23(b)(3) certification remains proper "even though other important matters will have to be tried separately."  *Tyson*, 136 S. Ct. at 1045.

*First*, whether Zimmer's sales associates performed a distinct occupation or business asks whether sales associates worked for themselves or in fact worked *within* Zimmer's business, a decision which turns on the common evidence of Zimmer's business model and where sales associates fit.  *See Alexander*, 765 F.3d at 993, 995.  Zimmer contends that some sales associates hired third parties to assist in their sales, an independent inquiry Zimmer did not track.  Whether or not Zimmer actually permitted sales associates to hire their own workers asks a question on the merits.  The relevant point here remains that Zimmer's sales associate agreements spoke to, and provided some common policy regarding, sales associates' power to hire workers.  Moreover, Zimmer's common agreements addressed associates' "appointment" and where they fit in the chain of sale, what and whose products were sold, for what price, where associates could sell products, and even whose customers all those doctors were (Dkt. No. 53-1 at 128, Exs. 25–28 at ¶ 1, 2, 5(c)–(d), 6(g)).  All of this speaks to where plaintiffs fit within (or without) Zimmer's business.

*Second*, whether plaintiffs' work customarily required direct supervision (or not) turns on the common evidence of the typical medical device salesperson's behavior, Zimmer's policies, and whether those policies gave Zimmer the right to closely supervise (Dkt. No. 53-1, Exs. 25–28 at ¶ 6(h)).  Zimmer's protest that it has not consistently monitored sales associates goes to its *exercise*, not its right, of authority.  *See ibid.*; *Ayala*, 59 Cal. 4th at 535–36.

11

1    *Third*, the specialized skill required (or not) to effectively perform as a sales associate turns on the common evidence of what typically makes a good medical device sales associate. *See Alexander*, 765 F.3d at 995.  That Zimmer rates different associates as more skilled or less skilled does not undermine the analysis.

*Fourth*, determining who supplied the instrumentalities typically required to perform the job can be shown by simply comparing Zimmer's standard-issue equipment with the equipment an effective Zimmer sales associate typically required.  *See Borello*, 48 Cal. 3d 355.  Zimmer contends it provided iPads to some associates and not to others but does not explain how that difference undermined common supply of instrumentalities.  Assuming a change in policy did not account for the difference, and even assuming an iPad rated as reasonably necessary for the job (a showing Zimmer has *not* made), this evidence weighs lightly in favor of two subclasses: (1) associates who received iPads; and (2) associates who didn't — hardly an individualized inquiry.

*Fifth*, Zimmer does not contest that the length of sales associates' service to Zimmer turns on whether the common sales associate agreements continued indefinitely or provided for length terms and renewal.  *See Alexander*, 765 F.3d at 996.

*Sixth*, sales associate compensation and entrepreneurial opportunity turns on common evidence.  Zimmer protests that different associates made different amounts or worked for differing compensation, but the present inquiry turns on commonality of *control* of associates' pay and opportunity and not the amount of pay or presence of opportunities.  *See ibid*.; *Ayala*, 59 Cal. 4th at 533.  For example, the evaluation of entrepreneurial opportunity in *Borello* asked whether workers had any opportunity at all, as opposed to varying degrees of some opportunity.  *See* 48 Cal. 3d at 357–58.  Thus, here, where Zimmer's common policies do speak to associate compensation, pay, and opportunity, the differences do not undermine predominance of common questions (Dkt. No. 53-1, Exs. 25–28 at ¶ 3).

*Seventh*, whether plaintiffs' work fit within Zimmer's principal business model turns on simply on whether Zimmer's business required medical device sales associates, evidence common to the class.  *See Alexander*, 765 F.3d at 996.

*Last*, Zimmer contends that many the sales representatives simply wanted to be contractors.  But the sales associates' varying viewpoints and understandings of their agreements with Zimmer cannot overturn the balance of the remaining factors in deciding whether plaintiffs rated as employees or independent contractors.  Public policy displaces the individual agreements.  *See Borello*, 48 Cal. 3d at 358; *Alexander*, 765 F.3d at 996–97.  It remains conceivable that plaintiffs' classification on the merits will be a close call, one where the parties' understanding plays a material part.  At this stage, however, denial of class certification on such speculative grounds would be unwarranted.

## B.    *DYNAMEX'S ABC TEST.*

Common questions and evidence also predominate under the current *Dynamex* framework.  As above, a Zimmer sales associate enjoys the protections of an employee unless:

> (A)   The person is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact;
>
> (B)   The person performs work that is outside the usual course of the hiring entity's business; [and]
>
> (C)   The person is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed.

Cal. Labor Code § 2750.3(a)(1).  Of course, since a worker is an employee unless the employer proves all three conditions, each individual factor may be dispositive in plaintiffs' favor.  Thus, the predominance of common issues in a single factor will support class certification.  *See Dynamex*, 4 Cal. 5th at 966.

Just as under the prior regime, common issues predominate both the questions of whether the putative class now operates within Zimmer's ordinary course of business and whether sales associates operate independent businesses from Zimmer.

Also as above, Zimmer's own policies offer common evidence of the right of control and direction it wields over the putative class.  Whether Zimmer relinquishes that control and direction *in fact* in individual cases may very well turn on individual questions, unsuitable for

United States District Court
Northern District of California

United States District Court
Northern District of California

class treatment.  But "because a worker who is subject, *either as a matter of contractual right or in actual practice*, to the type and degree of control a business typically exercised over employees would be considered an employee," it remains enough for class treatment here that plaintiffs' theory turns on Zimmer's common authority over its work force, whether exercised or not.  *See id.* at 958 (emphasis added).

Zimmer, tellingly, does not contest that common questions drive resolution of the *Dynamex* "ABC Test" here.  After all, now that the burden going forward lies with Zimmer to prove plaintiffs do actually work as independent contractors (unless it successfully argues for one of the statutory exemptions), it would be much easier for Zimmer to win that point against the class in a single action than to have to prove it against each of them in multiple actions. Indeed, Zimmer instead appears to concede the analysis should proceed via class treatment, arguing that the exception to the ABC Test for "bona fide business-to-business contracting relationship[s]" applies across the putative class.  *See* § 2750.3(a)(3), (e).  Whether the exemption applies, though, remains a merits question for later.

### C.   EXPENSE REIMBURSEMENT CLAIMS.

Plaintiffs also seek reimbursement for unpaid business expenses.  To start, since reimbursement depends on their misclassification, the predominant common questions above will also drive a large part of the merits of this claim.  And, despite Zimmer's protest, common questions will predominate the merits of this claim too.

California Labor Code § 2802 "requires an employer to indemnify its employees for expenses they necessarily incur in the discharge of their duties."  Reasonability of expenses does turn on the circumstances, but whether an expense rates as necessary turns "on the reasonableness of the employee's choices."  *Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal. 4th 554, 568, 169 P.3d 889, 897–98 (2007).  The United States Supreme Court has observed that this sort of objective standards lends itself to common resolution.  *See Amgen*, 568 U.S. at 467. Here, sales associates will submit many different expenses from many different circumstances and each and every one will need to be evaluated.  But they will be evaluated against an objective standard, *i.e.*, whether the ordinary, reasonable sales associate governed by Zimmer's

1  policies would find the expense necessary.  This common standard will predominate the

2  inquiry.

3        **D.    SECTION 17200 CLAIMS.**

4        Last, plaintiffs seek two forms of relief under California Business and Professions Code

5  § 17200.

6        *First*, plaintiffs seek restitution of unpaid expenses and employee benefits as a result of

7  their misclassification.  To start, then, the predominant classification questions described above

8  will again drive the basis for this claim as well.  Common questions also predominate the

9  remainder of this claim.  Due wages "are as much the property of the employee who has given

10  his or her labor to the employer in exchange for that property as is property a person surrenders

11  through an unfair business practice," so unpaid wages fall within the scope of restitution under

12  § 17200.  *See Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal. 4th 163, 178, 999 P.2d 706,

13  715 (2000).  And "'wages' include[] not only an employee's periodic monetary earnings but

14  also other benefits to which the employee is entitled as part of compensation."  *Espejo v. The*

15  *Copley Press, Inc.*, 13 Cal. App. 5th 329, 367 (2017); *Dep't Indus. Relations v. UI Video Stores,*

16  *Inc.*, 55 Cal. App. 4th 1084, 1091 (1997).  Assuming plaintiffs succeed on their

17  misclassification claims then, the wages and benefits due them under both Zimmer's common

18  policies and California labor law will drive resolution of this claim for the class.  Zimmer

19  objects that its benefit plans exclude the putative class members, even if they were

20  misclassified, precluding any claim for restitution.  This merits argument must wait to be

21  resolved at a later date.

22        *Second*, plaintiffs challenge whether sales associates, selling medical devices to doctors on

23  commission, can be classified as independent contractors at all under the Medicare Anti-

24  Kickback statute.  Whether Zimmer unlawfully classifies sales associates asks a question of

25  law, common to the class.  Zimmer's remaining objections, including that plaintiffs did not

26  properly raise the ground in their complaint, address the merits of the claim and must be left for

27  a later date.

28                                    *         *         *

In sum, common questions predominate the merits of plaintiffs' claims.  Under plaintiffs' theory of liability, Zimmer's common sales associate agreements and policies will decide whether its sales associates may remain independent contracts or must be reclassified as employees.  That analysis will serve as the bedrock for two derivative claims, first for unpaid business expenses, and second for restitution of unpaid wages and benefit.  Last, the lawfulness of Zimmer's classification of sales associates as independent contractors under the Medicaid Anti-Kickback statute presents a common question of law.

### 2.    TYPICALITY.

The claims or defenses of the representative parties must be typical of the claims or defenses of the class.  Here, Karl sells medical devices for Zimmer as an independent contractor and, just like the putative class, seeks reclassification as an employee, reimbursement of business expenses, and payment of unpaid wages and benefits.

Zimmer says Karl atypically lacks standing to pursue the § 17200 claim for unpaid benefits.  *See Kwikset v. Sup. Ct.*, 51 Cal. 4th 310, 322–27, 246 P.3d 877, 885–88 (2011).  But this argument largely rests on Zimmer's contention that its benefits plans exclude sales associates from entitlement even if they are reclassified as common law employees, an argument that targets Karl as much as any putative class member.  Rather than rendering him atypical, the common applicability of the defense confirms Karl's typicality on this front.

### 3.    ADEQUACY.

An adequate class representative will fairly and adequately protect the interests of the class.  Our court of appeals has explained that a representative meets this standard if they (1) have no conflicts of interest with other class members, and (2) will prosecute the action vigorously on behalf of the class.  *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003).

Nothing in the record suggests Karl's interests deviate from the interests of the other putative class members.  Nor does the record suggest any risk that Karl or his counsel would fail to prosecute the action vigorously.

Zimmer objects only that conflicts exist within the putative class because some sales associates act as "team leaders."  Aside from two vague examples of conflict between a team

leader and a line sale associate, Zimmer provides no basis to break apart the class.  Our court of appeals warns against denying class certification on the basis of speculative conflicts — particularly one tangential from the thrust of the suit.  *See In re Online DVD-Rental Antitrust Litigation*, 779 F.3d 934, 942 (9th Cir. 2015).  This suit addresses whether sales associates *and* their team leaders should be treated as employees of Zimmer, not whether sales associates and team leaders should always get along.  Karl remains adequate to litigate this suit on behalf of the putative class.

### 4.   SUPERIORITY.

Even if common questions predominate, a Rule 23(b)(3) class must be the superior method of adjudication, considering (among others):

> (A)   the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B)   the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C)   the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D)   the likely difficulties in managing a class action.

No other Zimmer employees have sued for employee misclassification, thus indicating that few, if any, other suits will emerge on an individual basis.  The stakes involved (total unreimbursed expenses and healthcare costs) for any single individual might reach one hundred thousand dollars, as one putative class member estimates.  But most appear to ballpark their damages nearer to fifty thousand dollars (Dkt. Nos. 142-1, -3, -4, -5, -8, -9, -10).  Legal fees in an individual suit would quickly swallow most, if not all, of those potential recoveries.

A court within California presents the superior forum for application of California law.  And, as for case management, plaintiffs propose a three-part trial plan: (i) trial of Labor Code claims before the jury; (ii) trial of § 17200 and PAGA claims before the Court; and (iii) damages before the Court or a special master.  Zimmer does not contest the superiority of a class in these circumstances.

5.     NUMEROSITY.

A class must be so numerous that joinder of all members is impracticable.  "The numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations."  *Gen. Tel. Co. of the Northwest, Inc. v. EEOC*, 446 U.S. 318, 330 (1980). Zimmer does not contest the sufficient numerosity of a 266 member class.

6.     OBJECTIONS.

In its Footnote 19, Zimmer buries an objection to use of improper electronic signatures in declarations under the local rules.  Aside from probing putative classmembers' states of mind regarding their expected recovery, the facts driving class certification here are Zimmer's own policies, not plaintiffs' declarations.  The objection is **DENIED AS MOOT**.

### CONCLUSION

For the foregoing reasons, the following class is **CERTIFIED**:

> Any person who, during the period commencing June 24, 2015, to the present, was hired or otherwise engaged as an independent contractor for the purposes of solicitation or sales of Zimmer Biomet products and/or services in California by Zimmer US, Inc., Biomet U.S. Reconstruction, LLC, and Biomet Biologics, LLC, or any one of them.

Lohr Ripamonti & Segarich LLP and Scherer Smith & Kenny, LLP are **APPOINTED** class counsel.  By **AUGUST 13, 2020 AT NOON**, the parties shall jointly submit a proposal for class notification with a plan to distribute class notice, including by first-class mail.  In crafting their joint proposal, the parties shall please keep in mind the guidelines for notice to class members given in the NOTICE AND ORDER RE PUTATIVE CLASS ACTIONS AND FACTORS TO BE EVALUATED FOR ANY PROPOSED CLASS SETTLEMENT (Dkt. No. 12).

**IT IS SO ORDERED.**

Dated:  July 28, 2020.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE